**REALCO SERVICES, INC., et al.**

v.

**Thomas J. HOLT et al.**

v.

**MTS AGENCIES, INC.**

**GIL-FLEX RENTAL, a Division of Flexi-Van Leasing, Inc.**

v.

**Thomas J. HOLT et al.**

Civ. A. Nos. 77–4097, 79–728.

United States District Court, E. D. Pennsylvania.

Nov. 19, 1980.

Andrew C. Hecker, Jr., Philadelphia, Pa., for Realco.

Arnold Levin, Philadelphia, Pa., John Gross, New York City, for defendants, Barry E. Ungar, Philadelphia, Pa., for third party defendants.

## MEMORANDUM AND ORDER

NEWCOMER, District Judge.

Defendants move for dismissal at the close of plaintiffs' case under Rule 41(b) of the Federal Rules of Civil Procedure. For reasons set out below defendants' motion will be granted and judgment will be entered for defendants and against plaintiffs. The following recitation of facts comprises findings made in a light most favorable to plaintiffs and, where supported by the record, after making all inferences necessary to sustain plaintiffs theories of recovery.

I. Findings of Fact

1. Plaintiff Realco Services, Inc. ("Realco") is a corporation organized under the laws of the state of Delaware with its principal place of business in the state of Illinois. Realco is engaged in the business of leasing trailers.

2. Plaintiff Integrated Container Services, Inc. ("ICS") is a corporation with its principal place of business in the state of New York. ICS is engaged in the business of leasing trailers and container equipment.

3. Plaintiff Interpool is a corporation organized under the laws of the Bahamas with its principal place of business in the state of New York. Interpool is engaged in the business of leasing containers and equipment.

4. Plaintiff SSI Container Corporation International B. V. ("SSI") is a corporation organized in the Netherlands with an office in the United States at 2 Embarcadero, San Francisco, California. SSI is engaged in the business of leasing containers and equipment.

5. Plaintiff Ideal Container di Alfonso Donati ("Ideal") is a corporation organized under the laws of Italy with its principal place of business in Genoa, Italy. Ideal is engaged in the business of leasing containers and equipment.

6. Plaintiff Nippon International Container Service Co., Ltd. ("NIC") is a company organized under the laws of Japan with its principal place of business in Tokyo, Japan. NIC is engaged in the business of leasing containers and equipment.

7. Plaintiff CTI Container Leasing Corporation ("CTI") is a corporation organized under the laws of the state of Delaware with its principal place of business in the State of New York. CTI is engaged in the business of leasing containers and equipment.

8. Plaintiff Gil-Flex Rental ("Gil-Flex"), a division of Flexi-Van Leasing, Inc., is a corporation organized under the laws of Delaware with its principal place of business in the State of New York. Gil-Flex is engaged in the business of leasing containers and equipment.

9. Holt Hauling & Warehousing System, Inc. ("Holt Hauling") was incorporated in the Commonwealth of Pennsylvania in 1964. At all relevant times, Holt Hauling was located at 701 North Broadway, Gloucester City, New Jersey. Leo Holt owned 43% of the stock, Thomas Holt owned 43% of the stock and Edna White owned the remaining stock. Holt Hauling was engaged in the business of warehousing.

10. Holt Marine Terminal, Inc. ("Holt Marine") was incorporated in the state of New Jersey in 1969. At all relevant times, Holt Marine was located at 701 North Broadway, Gloucester City, New Jersey. Holt Marine was a wholly-owned subsidiary of Holt Hauling and its business was stevedoring.

11. B. H. Sobelman & Co., Inc. ("Sobelman") was incorporated in the Commonwealth of Pennsylvania in 1946. At all relevant times, Sobelman was located at 248 Bourse Building, Philadelphia, Pennsylvania. Sobelman was a wholly-owned subsidiary of Holt Marine and it acted as a shipping agent. Sobelman also acted as the general agent for MTS.

12. T & L Leasing ("T & L") was incorporated in New Jersey on February 13, 1974. Thomas Holt owned 40% of its stock, Leo Holt 25%, Bernard Gelman 17½%, Lorraine Robins 12½% and Thomas A. White 5%. T & L Leasing was engaged in the business of leasing and selling equipment.

13. Holt Motor Express, Inc., ("Holt Motor") was incorporated in Delaware on January 4, 1965. Leo Holt owned 43% of its stock, Thomas J. Holt owned 43%, and Edna White owned 14%. Holt Motor was engaged in the trucking business.

14. Camden Refrigerating Terminal ("Camden") was incorporated in the state of New Jersey in 1939. Thomas A. White owned 80% of the stock, Lorraine Robins owned 15% and Bernard Gelman owned 5%. Camden Refrigeration was involved in refrigeration of perishable goods.

15. Waterside Ocean Navigation, Inc., ("Waterside-Pennsylvania") was incorporated in the Commonwealth of Pennsylvania on August 11, 1975. Waterside-Pennsylvania chartered the vessel *Laurentian Forest*. Thomas J. Holt owned 100% of its stock. The *Laurentian Forest* was operated by Marine Transport Service, Inc.

16. Worldwide Marine Trading Corp. ("Worldwide") was incorporated in Liberia on December 3, 1975. Thomas J. Holt owned 100% of its stock. Worldwide chartered the vessel *Finn-Builder*. The *Finn-Builder* was operated by MTS.

17. Gloucester Shipping Corporation ("Gloucester") was incorporated in Liberia on December 3, 1975. Thomas J. Holt owned 100% of its stock. Gloucester chartered the vessel *Finn-Amer*. The *Finn-Amer* was operated by MTS.

18. At all relevant times Thomas J. Holt was an individual residing at 10710 Ellicott Road, Philadelphia, Pennsylvania. He was a minority stockholder in T & L, Holt Motor, and Holt Hauling.

19. Marine Transport Service, Inc., ("MTS") was incorporated in New Jersey on October 1, 1975. MTS was incorporated to operate and charter vessels. MTS was incorporated by Harry D. Ambrose, Jr., at the direction of Bernard Gelman, an employee of Thomas Holt.

20. At all relevant times, Paul Semack ("Semack") was an individual residing in the state of New Jersey. Semack was the president of MTS at the time of MTS's contracting with plaintiffs. John Kavula ("Kavula") was an individual, who was vice-president of MTS.

21. Semack asked Marvin Robinson, vice-president and operations manager of B. H. Sobelman to act as general agent for MTS and Sobelman performed agency services for MTS.

22. The initial allocation of shares in MTS was that Semack, Thomas Holt, and Kavula were each 33% shareholders in MTS. The understanding of the initial allocation of responsibilities for MTS was that Thomas Holt would provide financing enabling MTS to engage in business. Thomas Holt's responsibility was "the chartering of vessels, the start-up financing, the insurancing of vessels, the accounting and financial records." [Tr. 457]. Semack and Kavula were to devote themselves full-time to the "selling of freight, the traffic of the freight, the maintenance of tariffs, the filing of rates, the hiring and firing of people that were involved in the day-to-day operation, the appointment of overseas agents, [and] the appointment of out-port agents in the United States." [Tr. 457].

23. Bernard Gelman ("Gelman") was initially the secretary of MTS. Gelman was treasurer of several defendant companies and is Thomas Holt's accountant.

24. Semack never received stock certificates representing his interest in MTS, although he repeatedly requested that they be delivered.

25. Thomas Holt directed employees of his companies to prepare payrolls, financial statements, and computer services for MTS.

26. Thomas Holt arranged insurance for MTS and kept the insurance policies at his offices at 701 North Broadway, Gloucester City, New Jersey.

27. Semack wrote a letter dated November 7, 1975, explaining to James S. Klein of Aramco that MTS was a steamship company and not an agent (P–81). Semack represented in that letter that MTS, as a steamship company was owned by himself, "Jack Kavula", and Waterside Ocean Navigation of Pennsylvania. Semack did not mention Thomas Holt's name because Holt wished to hide his entry into the steamship business as a competitor of customers of his other companies.

28. On April 1, 1976 an accounts receivable financing agreement between First Pennsylvania Bank and MTS was executed by Semack, as president of and on behalf of MTS, (P–74). The note representing the agreement was guaranteed by certain companies owned and controlled by Holt. (P–194).

29. Sobelman, T & L, Camden, and Holt Marine advanced funds to MTS at the direction of Thomas Holt, Lorraine Robins, Bernard Gelman and John Evans.

30. On several occasions, Sobelman made disbursements in its capacity as agent for MTS without receiving bills. These activities were a departure from its usual practice. MTS was the only account for which Sobelman paid bunker charges and charter hire.

31. MTS officers leased automobiles from T & L without formal lease agreements.

32. While out of the country Semack and Kavula left signed blank checks on MTS accounts to be used by Gelman to pay MTS bills.

33. The controller of Holt Hauling, John Evans, ("Evans") visited the MTS offices in New York on a weekly basis. Evans supervised MTS's accounts receivable and payable and assisted MTS in setting up accounting records. Evans took MTS accounts receivable freight checks and delivered them to First Pennsylvania Bank.

34. Employees of MTS were told by Thomas Holt not to communicate with the First Pennsylvania Bank regarding financing.

35. Evans prepared MTS's 1975 Federal Corporate Income Tax Return, as well as a formal request for an extension of time to file MTS's return. In doing so he signed his name as "controller" of MTS.

36. MTS's tax records, including various state income and city wage tax records, were kept at 701 North Broadway, Gloucester City, New Jersey, offices of Thomas Holt and some of the Holt corporate defendants.

37. Thomas J. Holt, Holt Cargo, Sobelman, T & L, and Waterside-Pennsylvania all maintained accounts at First Pennsylvania Bank. Along with MTS, they were considered one "account" by the officers of First Pennsylvania Bank.

38. Evans, Gelman, Lorraine Robins and other personnel of the Holt corporate defendants handled all MTS banking transactions with MTS's principal lender, First Pennsylvania Bank.

39. As of October 1, 1976 advances had been made to MTS by Holt-controlled companies in the amount of $1,936,327.94.

40. Financial statements prepared by Holt personnel showed MTS's capitalization as either $50.00 or $100.00.

41. New York attorneys for Thomas Holt and for certain Holt corporate defendants represented MTS in various legal matters.

42. On September 16, 1980, default judgment was entered against MTS for failure to appear, plead, or otherwise defend.

43. Credit inquiries about MTS were directed by all parties to Vincent DiPatre at First Pennsylvania Bank ("DiPatre").

44. DiPatre received credit inquiries from plaintiffs Realco, Interpool, CTI, SSI, Nippon and Gil-Flex. In response to those inquiries, DiPatre told plaintiffs that MTS was a "start-up operation" and that First Pennsylvania was not relying on the credit of MTS in advancing funds to MTS. DiPatre informed some people who inquired that the loans to MTS were guaranteed by certain Holt-controlled companies.

45. On January 1, 1976, Semack signed a "User Membership Agreement" with Realco, setting the conditions of MTS's use of Realco trailers, as President of and on behalf of MTS. On December 1, 1975, Jack Kavula signed a membership agreement with Interpool as "Sr. Vice President" of MTS and "for" MTS. On October 28, 1975 Semack signed an ICS "Master Lease Agreement" as "President" of "lessee", which was the designation given to MTS in the preamble. Plaintiffs have offered no evidence to show that Semack or Kavula signed any container leases in an individual capacity, or that Thomas Holt or any of his employees signed *any* lease agreements for containers.

46. Thomas Veljacic ("Veljacic") was traffic manager for MTS. He told George Basso ("Basso"), a representative of CTI, that Thomas Holt was a "backer" of MTS, a term he used after he was told by Kavula that Thomas Holt was a "backer". Veljacic understood the word "backer" to mean "investor". Veljacic directed Basso to MTS's accounting department for the necessary credit references.

47. Khalil El-Nahrawy ("Khalil") was an accountant at MTS for four or five months in 1977. Khalil directed MTS employees to forward incoming bills to Holt's

offices in Gloucester City. Khalil testified that Evans, told him that Thomas Holt, John Kavula, and Paul Semack were partners in MTS. Khalil also testified that Evans drew for him a flow chart showing the "relationship" of Holt, his controlled companies and MTS. The chart, if it ever existed, did not show any percentages of ownership or control, but merely that Thomas Holt owned, concurrently, an interest in certain companies and in MTS.

## II. Conclusions of Law

Plaintiffs contend that Thomas Holt, the corporate defendants, Semack, and Kavula should be held liable for the debts of MTS. Plaintiffs assert the following legal theories to support that contention:

1. Thomas Holt, the corporate defendants, Semack, and Kavula were engaged in a joint venture with one another and MTS; or

2. The same parties were engaged in a partnership;

3. MTS was an agent for Thomas Holt and the corporate defendants, who acted as MTS's undisclosed principal.

Plaintiffs assert that the corporate identity of MTS must be disregarded "in order to prevent the perpetration of fraud, injustice and inequity." (Plaintiff's trial brief at 3). The Court cannot, however, treat this last assertion as a separate theory of liability, except as to the shareholders of MTS: Semack, Kavula and Holt or Waterside-Pennsylvania. Instead, the "piercing" question is really the threshold over which plaintiffs

must cross before they can assert that any of the defendants were *actually* a joint venture, a partnership, or principals.[1]

### A. Piercing the Corporate Veil, or Disregarding the Corporate Entity.

■ The vast majority of plaintiffs' case consisted of a showing that Thomas Holt and the Holt-controlled companies exercised "dominion and control of the operations of MTS." (Plaintiffs' trial brief at 2). This control, assert plaintiffs, yields responsibility for MTS's corporate actions, because "[p]laintiffs' damages are the result of that dominion and control." *Id.* Because of their responsibility, plaintiffs claim, the corporate form of MTS should be disregarded.

The generally accepted "classic statement"[2] of the prevailing legal standard for "piercing the corporate veil" is

> that a corporation will be looked upon as a legal entity as a general rule and until sufficient reason to the contrary appears; but when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons.

*United States v. Milwaukee Refrigerator Trans. Co.*, 142 F. 247, 255 (E.D.Wis.1905).[3]

Plaintiffs quote the analysis of a New York state court. The Court finds the analysis to be apposite and useful.[4] In *Lowendahl v. B & O Railroad*, 247 App.Div. 144, 287 N.Y.S. 62, *aff'd* 272 N.Y. 360, 6 N.E.2d 56 (1936), the court held that in order for a

---

1. There are really two agency theories here. One is that the corporate forum should be disregarded to reveal Holt and his companies as a principal and not as a shareholder of MTS. The other accepts MTS as a legitimate corporate entity, but asserts that MTS business was to act effectively as an agent for Holt and the Holt-controlled companies. The Court will treat the first of these theories within the analysis relevant to piercing the corporate veil. The second theory will be analyzed thereafter.

2. Commentators have noted that this standard is "not especially helpful in resolving concrete cases." Frey, Choper, Leech, and Morris, Cases and Materials on Corporations 49 (2d ed. 1977).

3. For other attempts to formulate the analysis, see Douglas & Shanks, *Insulation from Liability Through Subsidiary Corporations*, 39 Yale L.J. 193 (1929), Rodin, *The Endless Problem of Corporate Personality*, 32 Colum.L.Rev. 643 (1932).

4. "There is no doubt that an admiralty court has as part of its general jurisdiction sufficient equitable powers to apply this test." *Zubik v. Zubik*, 384 F.2d 267 (3d Cir.) *cert. denied*, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1967), citing a similar test.

court to allow a piercing of the corporate veil, the facts must demonstrate:

(1) [c]ontrol, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) [s]uch control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; and

(3) [t]he aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Lowendahl*, 247 App.Div. at 157, 287 N.Y.S. at 76.

The Court notes that the Court of Appeals for this circuit has, in another context, analyzed the problem in similar terms but starting at another point.

Once fraud or injustice demand piercing the corporate veil, then the intertwining of personal affairs with a family corporation can provide additional grounds for arguing that the defendant cannot be heard to complain.

*Zubik v. Zubik*, 384 F.2d 267, 274 (3d Cir.) *cert. denied*, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1967).

Plaintiffs urged in oral argument that careful use should be made of the word ":fraud" in this context, citing *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.*, 540 F.2d 681 (4th Cir. 1976). In that case the court stated that "proof of plain fraud is not a necessary element in a finding to disregard the corporate entity." *DeWitt* at 684. We accept that statement, but as something less than what plaintiffs here urge it to mean. Plaintiffs seem to suggest that there need be no wrongful activity; indeed plaintiffs' argument from the outset rests upon the notion that "con-

trol" creates "responsibility." In the *De-Witt* case, while there may have been no technical fraud, there were a series of acts that amounted to more than simple control. Apart from the aspects of undercapitalization, failure to observe corporate formalities, and the controlling shareholder's misappropriation of corporate funds, all of which were presented in the *DeWitt* case, the controlling shareholder in *DeWitt* assured plaintiff-creditor that he would personally guarantee the obligations of the purportedly sham corporation. By contrast, in the case considered here plaintiff has made no showing of any express or implied guarantee of MTS's debts or obligations under the container lease contracts. Indeed the information available through credit references which MTS gave in response to all inquiries should have dispelled any notions of guarantees. Some container companies did call Mr. DiPatre at First Pennsylvania Bank, and he made it clear that MTS was a startup operation, and that it received loans from the bank only because of collateral guarantees.

Analyzing the plaintiffs' case with the very criteria recited by them, *Lowendahl v. B & O Railroad*, it is difficult to perceive an inequity that could result if we do not allow a piercing of the corporate veil. As to (1) control, plaintiffs have not shown that Holt, or any of the Holt enterprises "exercised such control over policy, or business practice in respect to the transaction attacked" that MTS had "no separate mind, will or existence of its own." Although Thomas Holt did indeed exercise total control over the financing of MTS operations, all the testimony shows that this was his anticipated contribution to the fledgling corporation. As to the transaction at hand, the contracts for leasing of containers, Holt had really very little control. The negotiations were carried out by MTS officers and employees, and the documents were executed on its behalf by MTS officers or employees. The kind of control that Holt and the Holt-controlled companies exercised was within the scope of financing and accounting, and not

a complete domination of all business affairs.[5]

As to (2), control used to commit fraud or wrong, or a dishonest or unjust act, again, the facts offered by plaintiff, drawing all justifiable inferences favorable to plaintiffs, reveal no evidence of any siphoning of funds or any other wrong relating to plaintiffs. In contradistinction to the *DeWitt* case, the flow of improper funding, if there was any, was in the direction of MTS. That is, Holt directed his companies to provide loans and services to MTS that were on very favorable terms, if there were any terms spelled out at all. Plaintiffs offer this as evidence of control by Holt and his other companies. While it may show sloppy accounting, Holt's exercise of that control did not effect a dishonest purpose. He was not taking money out of MTS, he was putting it in; indeed, to use the parlance of corporate law, he was putting more money at risk, rather than funnelling it out of the corporation. Only if the initial organization and operation of MTS was a fraud on potential creditors can Holt's exercise of his power to put money into MTS be viewed as an exercise of control to cause a fraud. Because the record shows that MTS was created as a genuine profit-seeking venture and not as a fraudulent device, this characterization of Holt's control cannot be sustained.

We note that Holt's own accountants prepared financial statements for MTS that showed MTS's capitalization to be either $100.00 or $50.00. The issue of undercapitalization is more fully discussed below, but at this juncture it is sufficient to conclude that a very low capitalization in and of itself cannot form the fraud or misdeed anticipated by the equitable principles quoted above. Assuming, as plaintiffs would have us do, that MTS was capitalized with only $50.00, there is still an insufficient case made out of an abuse of control by Holt to effect forbidden purposes.

Finally, (3) the aforesaid control must proximately cause the injury or unjust loss. Plaintiffs' injury—a default on their container leases—was caused by a number of factors. Chief among them was MTS's inability to weather financial disaster. We note, however, that plaintiffs are sophisticated commercial entities who are fully aware of the hazards of the shipping industry and the means by which commercial creditors can secure themselves. To suggest, as plaintiffs must, that they were misled, or that the corporate form of MTS was an implied promise of economic strength, is a misstatement of the facts of the case as adduced at trial (there is no such evidence of misrepresentation) or a misstatement of the law (mere corporate existence is not a guarantee of economic survival).

Plaintiffs urge, and we agree that in essence the test "is simply whether or not recognition of corporateness would produce unjust or undesirable consequences inconsistent with the purpose of the concept." Henn, Handbook of the Law of Corporations 252 (1970). If the purpose of the private business corporation is to encourage the accumulation of capital for investment, and to allow the venture capitalist to be secure in the limitation of his possible losses, then the focus of the inquiry should include the legitimacy of the initial venture, and the bona fides of the corporation when it is first created and as it is operated. Certain factors are often recited as the litany of attributes of a corporate entity that will be disregarded. Among them are gross undercapitalization, failure to observe corporate formalities non-payment of dividends, insolvency of debtor corporation at the time of contracting, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, and the absence of corporate records.[6] Two of these attributes are arguably

---

**5.** To urge, as plaintiffs have not done here, that Semack, Kavula and Thomas Holt together exercised this kind of control, i. e., all of the shareholders controlled the corporation, therefore they exercised total control, would be tautologous.

**6.** *DeWitt Truck Brokers, supra,* gives a well-

present here. MTS's capitalization, if it was only $50.00, was clearly low. Whether it was inadequate for purposes of discerning unfairness to a contract creditor is an open question.[7] Corporate formalities were observed at the outset of MTS's existence, but, making all inferences that plaintiffs urge, it would seem that Semack, Kavula, and Thomas Holt were fairly cavalier about the regularity and formality of directors' meetings. Nevertheless, MTS was a valid corporation under New Jersey law,[8] and there is simply not enough evidence to show that it lost its identity as a corporation by virtue of sloppy management and casual observance of formalities.

As to the other indices of unfairness, MTS never paid dividends, but that factor is really irrelevant under these circumstances. There was no siphoning of corporate assets, corporate records were indeed kept, and all of MTS's officers, if not its directors were active in running the company. More importantly, as a measure of the character of MTS as a corporation that was a going concern, MTS had offices in Baltimore and Houston, and a payroll in New York alone that listed about 25 employees. In short MTS operated as a corporation, and to all the world it appeared to be a corporation. This last observation is especially relevant in light of the purpose of these indicia of corporate existence. They are a method of deriving equity, justice, or fairness. As mentioned above, plaintiffs are sophisticated commercial entities. They know the risks of their trade and how to avoid loss. They know the importance of credit information and how to discover the financial position of corporations with which they deal. In sum, it is difficult to see how any injustice will occur if plaintiffs are denied the opportunity to assert claims against the investors who stood behind MTS.

### B.  Joint Venture and Partnership.

Plaintiffs allege that the defendants were engaged in a joint venture with one another and MTS, or, that defendants were engaged in a partnership with one another and with MTS.

Plaintiffs cite *McRoberts v. Phelps*, 391 Pa. 591, 138 A.2d 439 (1958) for the definition of joint venture. The Court accepts *McRoberts* as authority, but for a different conclusion than plaintiffs urge. *McRoberts* quotes a treatise with approval for the proposition that a joint venture is "a special combination of two or more persons, where, in some specific venture, a profit is jointly sought *without any actual partnership or corporate designation.*" (emphasis added) *McRoberts* at 598, 138 A.2d 439. Without delving too deeply into a factual analysis of *McRoberts*, the Court merely notes that there was no corporate designation for any of the plaintiffs in *McRoberts*, and in keeping with the quoted definition, joint venture was the only appropriate description of their relationship. In the case before the Court there is a validly-formed corporate entity through which some of the defendants transacted business. By any reading of the *McRoberts* definition we are precluded from finding a joint venture here.

There was evidence presented to show that certain Holt-controlled companies lent funds and services to MTS. Plaintiffs seem to conclude that this constitutes the contribution of a venturer to a joint venture. This ignores, however, that those companies were never entitled to participate in any profits that MTS might earn, and as profit-sharing is a defining element of joint ventures, see *McRoberts* at 599, 138 A.2d 439, the Court must conclude that the transfers were loans.

Plaintiffs' allegation that MTS was a partner in a partnership with defendants, *or*, that behind MTS stood a partnership of defendants, is equally precluded by the defi-

documented list of these factors. *DeWitt* at 686–87.

7.  Note, *Disregard of the Corporate Entity*, Ohio S.L.J. 441 (1967).

8.  New Jersey law controls the question of formal corporate existence. *Broderick v. Stephano*, 314 Pa. 408, 171 A. 582 (1934). Restatement (Second) of Conflict of Laws §§ 298, 307 (1971).

nition of partnership. Plaintiffs cite *Pappas v. Klutinoty*, 383 Pa. 184, 118 A.2d 202 (1955) for the propositions that partnership results from the intention of the parties involved to enter into a partnership, and that a written agreement demonstrating partnership is unnecessary. This is an accurate statement of the law, but upon the facts adduced at trial the Court finds no evidence that the parties *intended* to enter into a partnership. One employee testified that he understood Thomas Holt to be a "partner" in MTS, but (1) his understanding of the intended legal relationship is irrelevant, and (2) his characterization of that legal relationship cannot be accepted in its legal and conclusory sense.

C. Agency: MTS as the Agent for Defendants Holt and Holt-controlled companies.

█ Restatement (Second) of Agency, § 2(1) (1958) defines agency as "the fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act in his behalf and subject to his control and consent by the other so to act." The Court notes that the authors of the Restatement themselves urge caution in the use of this definition because "[t]he brevity of a definition necessarily makes it an incomplete and inaccurate statement." Restatement (Second) of Agency at 7.

The Court is urged to deduce from the facts presented in plaintiffs case, making all necessary inferences in plaintiffs' favor, and viewing all the evidence in a light most favorable to the plaintiffs, that there was an agency relationship here based on "an understanding between the parties." (Plaintiffs' Trial Brief at 14).

It is clear that Thomas Holt and the Holt-controlled defendants had a degree of control over the vessels carrying freights under MTS contracts, but in light of the fact that the Holt companies were the *charterers* of those vessels that is hardly surprising. Whatever the formal relationship between MTS and Holt-controlled companies that chartered the vessels used by MTS, it

is clear from the testimony at trial that the officers (who were shareholders) running MTS did not consider themselves agents for anyone, and did not represent themselves as such.

What is clear from the testimony is that Thomas Holt wanted originally to hide his involvement with MTS for fear of jeopardizing his business relations with other steamship companies who were his customers. Nevertheless, a number of people in the shipping business came to know of his involvement. Plaintiffs may have been among those who learned of Holt's interest in the new company. However, to accept their assertion that they concluded that MTS was an agent for Thomas Holt and his companies, and that their reliance on this conclusion creates an agency relationship, would be to substitute their understanding for the understanding of the parties to the alleged agency relationship. As noted above, the really germane testimony was that of Semack, who insisted in court, consistently with his correspondence to third parties at the time, that MTS was a steamship company in its own right, and not an agent in either a maritime sense or a legal sense.

III. Conclusion

For the reasons stated above, the Court finds that plaintiffs, despite imaginative and strenuous efforts of counsel, have failed to make out a case showing sufficiently fraudulent use of the corporate form to justify disregarding the corporate entity. The evidence shows that plaintiffs knew, or should have known, the nature of the entity with which they were dealing, and that there were no misrepresentations which could have induced plaintiffs to rely on the credit or any implied guarantees of defendants. The evidence does not show that any of the other indications of improper use are present in this case.

To the same effect, the Court must conclude that plaintiffs have failed to make out a case for visiting upon Thomas Holt the debts of MTS on the basis of an agency relationship. Plaintiff asks the Court to

infer from the common commercial interests of MTS and other companies controlled by Thomas Holt that MTS was an agent for Thomas Holt and the Holt companies. The evidence shows only that Holt was an undisclosed shareholder in MTS, and not that MTS was his or his companies' agent.

Because plaintiffs have failed to show a right to relief, judgment is entered against them.