**WORLDWIDE MARINE TRADING CORP., et al.**

v.

**MARINE TRANSPORT SERVICE, INC., et al.**

**T & L LEASING, INC., et al.**

v.

**MARINE TRANSPORT SERVICE, INC. et al.**

**Civ. A. Nos. 80–1909, 80–4341.**

United States District Court, E. D. Pennsylvania.

Oct. 28, 1981.

Arnold Levin, Philadelphia, Pa., for plaintiffs.

Barry E. Ungar, Philadelphia, Pa., for Semack and Kavula.

Ronald H. Surkin, Philadelphia, Pa., for Castelbuono.

Gilbert Newman, Philadelphia, Pa., for Austrian, Lance & Stewart.

---

Henry H. Janssen, Philadelphia, Pa., for Finnowners.

## MEMORANDUM AND ORDER

NEWCOMER, District Judge.

Defendant Austrian, Lance and Stewart, P. C. ("Austrian") moves for summary judgment, and defendants "Finnowners" (comprising Amer-Sea O/Y Tuusula and Kommandiittiyhtio Jussi Ketola & Company) move to dismiss in this antitrust, tortious interference with contractual relations, and malicious prosecution case.

The facts of this case have been recited elsewhere, but a degree of elaboration is necessary. Plaintiffs allege that defendants conspired to injure them by withholding money due them, withdrawing two ships from their control, and advising creditors of MTS, Inc. to sue plaintiffs. *See Worldwide Marine Trading Co., et. al. v. MTS, Inc. et al.*, Civil Action No. 80–1909 (January 28, 1981 E.D.Pa.) (Order granting in part and denying in part motion to dismiss), *Realco Services Inc. v. Thomas J. Holt, et al.*, 513 F.Supp. 435 (E.D.Pa.1981).

### 1. Austrian's Motion to Dismiss

Anthony Castelbuono was at times relevant to this case counsel to defendant Paul Semack and MTS Agencies and a member of Austrian.[1] Plaintiffs allege that he was the "mastermind" of the scheme to injure plaintiffs, and that he "personally"[2] and through Austrian held checks payable to MTS, Inc. that by virtue of a security agreement should have been remitted to the First Pennsylvania Bank. *See Realco*, 513 F.Supp. at 437–38. Castelbuono testified in depositions that he held them until it could be determined to whom they belonged "and the responsibility for that question was satisfactorily removed from Mr. Semack and Mr. Kavula." (Deposition of Castelbuono

---

[1] Castelbuono actually joined Austrian shortly after having been retained by MTS Agencies.

[2] This term appears to have been borrowed from a letter of First Pennsylvania Bank's counsel (Plaintiff's Exh. AB–39), in which First Pennsylvania asserted its right to certain monies, and threatened action against Castelbuono "personally" if he did not release them.

at 209–210). Plaintiffs allege that this action caused them to default on their charters, and permitted Finnowners to revoke the charters on the ships Finn-Amer and Finn-Builder.

Castelbuono flew with Semack to Helsinki in April 1977 to meet with the Finnowners. Castelbuono's unrebutted testimony is that he made the trip as Semack's attorney and that Austrian was paid for his services. (Deposition of Castelbuono at 222–223).

On May 6, 1977 Semack, Kavula, and plaintiffs agreed to forward the freight monies to First Pennsylvania, and as a part of the arrangement plaintiffs agreed to pay Austrian for Castelbuono's services in drafting the agreement instrument. Plaintiffs also executed releases in favor of Semack, Kavula, Austrian and Castelbuono.

In carrying out the May 6 agreement Castelbuono deposited freight monies into an escrow account at Barclays Bank of New York, and acted as the escrow agent.

Also on May 6, 1977, plaintiffs allege, Castelbuono gave an attorney for Finnowners copies of the ships' manifests [3] for the Finn-Amer and the Finn-Builder, knowing that the Finnowners would attempt to place liens on the freights held by Castelbuono that were to be sent by him to First Pennsylvania. Finnowners did send out lien notices to the freight holders whose names they learned and they sought to have payment stopped on checks for those freights. (Deposition of Honan at 21, 39).

Plaintiffs argue that the facts recited above show that Castelbuono was a member of the conspiracy to harm plaintiffs, and that the harms are actionable wrongs sounding in antitrust and tort and that Austrian is vicariously liable for Castelbuono's actions. Austrian argues that in order for it to be liable it must have explicitly taken part or authorized any activity beyond the scope of giving legal advice. Because plaintiffs were not clients of Austrian, Austrian argues, the firm could only be responsible by a theory of respondeat superior if it specifically permitted him to act in a way that was outside the scope of his professional duties as a lawyer.

Plaintiffs essentially agree, but argue that the facts demonstrate (1) that Castelbuono's actions exceeded the "lawyer's privilege to advise," and (2) that Austrian need not have specifically authorized those actions. The Court has already recognized the privilege lawyers have, see *Worldwide Marine Trading, et al., supra,* slip. op. at 5, in its ruling on the motions to dismiss. The burden is on plaintiffs to show "self-interested activity on the part of Castelbuono that went beyond the scope of his practice of law." This is the primary inquiry, and if plaintiffs can demonstrate such activity on Castelbuono's part, then the liability of Austrian can be considered.[4]

The undisputed facts establish that Castelbuono was the lawyer for some of the defendants, and that he carried out certain functions for them. Nowhere in the record is there any showing that Castelbuono collected anything other than a fee for his services. Plaintiffs' case appears to rest on the theory that Castelbuono facilitated the allegedly illegal schemes, or, indeed, that he

---

**3.** The evidence on this point is contradicting only in that Castelbuono and Honan have testified differently as to what Honan was given. Castelbuono stated that he gave Honan copies of the checks. (Castelbuono Deposition at 216, 379.) Honan testified that Castelbuono gave him what he uncertainly recalls was a manifest (Honan Deposition at 20, 36), but that he may have been given copies of the checks (Honan Deposition at 35, 36).

**4.** The Court notes that it has previously ruled on the issue of the existence in law of the cause of action alleged. The cases cited by plaintiffs support the proposition that an attorney can be liable as a culpable participant in a conspiracy if the necessary factual predicate is proven, *see e.g., Steinberg,* 22 A.D.2d 776, 254 N.Y.S.2d 7 at 8. Plaintiffs include in an explanatory parenthetical to that citation, however, "(attorney acting in a professional capacity guilty of fraud)," when in fact the decision of the New York court was that the facts alleged, *if proven,* could sustain a cause of action against the attorney. The Court now must decide not whether or not a lawyer might be proven a conspirator in a case such as this one, but whether or not in this case there are sufficient material and triable issues of fact to warrant a trial. Fed.R.Civ.P. 56.

was the "mastermind." Plaintiffs argue that even acting only as a lawyer Castelbuono can be liable and they cite several cases in which attorneys, using their skills as attorneys, were held in as defendants. The Court's analysis will focus initially on whether or not Castelbuono's actions are similar to the actions of the lawyers in those cases.

Plaintiffs seem to concede that there is no evidence that Castelbuono was ever rewarded in any way other than as a fee-earner and that there is no evidence that he had any "stake" in his clients' activities greater than a professional interest. Thus, as plaintiff concedes, the Court must consider "[t]he more complex problems ... posed [by the case of] the attorney who acts not for his own account, but for the benefit of his client." Plaintiff's Memorandum of Law in Opposition to Summary Judgment Motion at 24.

In the cases cited by plaintiffs, attorneys were the knowing participants in frauds or tortious acts carried out by their clients. For example, in *Newburger, Loeb & Co. Inc. v. Gross*, 563 F.2d 1057 (2nd Cir. 1977) the defendant lawyer was found at trial to have been "at the heart of [the] entire matter, guiding the entire plan, carrying threats to the dissidents, and knowingly counseling, advising, and instituting baseless and fraudulent lawsuits." 563 F.2d at 1080. Indeed in *Newburger* the defendant lawyer issued a false opinion letter to carry out the illegal transactions. *Id.* In *Steinberg v. Guild*, 22 A.D.2d 776, 254 N.Y.S.2d 7 (Sup.Ct.1964) a lawyer was alleged to have conspired with his clients to defraud subscribers to a real estate syndicate by pre-dating and otherwise changing a purchase contract to conceal a fraudulent arrangement from the subscribers. A motion to dismiss the complaint was denied, because such conduct, under New York law, constitutes activity beyond the "scope of honorable employment" of a lawyer. *Steinberg*, 254 N.Y.S.2d at 8–9; *Newburger*, 563 F.2d at 1080. In *United States v. Benjamin*, 328 F.2d 854 (2nd Cir. 1964), a criminal case brought under the Securities Act of 1933, the defendant lawyer issued a false opinion letter and other documents containing language that the Court of Appeals characterized as "completely false." 328 F.2d at 858. The lawyer's role was "far more than that of an attorney. He told [a purchaser and distributor of shares] he was acting as a 'trustee' for some of the principals. . . ." He offered financial aid if the purchaser and distributor would undertake some distribution of the stock, and he attempted falsely to minimize his client's role in fraudulent schemes during a Securities and Exchange Commission investigation. 328 F.2d at 863–64.

The cases cited by plaintiffs fall into two rough categories. The first, which is the category into which this case fits, is of instances where lawyers acted as advisors to clients who carried out tortious or criminal activities. The degree to which the lawyers participated, initiated, or furthered the schemes determined their culpability. Examples of such cases have been recited above. The second category, which might be considered an intersecting set of the first, is of those cases in which lawyer assisted his client in using the legal process tortiously or maliciously. *See, e.g. Sachs v. Levy*, 216 F.Supp. 44, 46 (E.D.Pa.1963), *Adelman v. Rosenbaum*, 133 Pa.Super. 386, 3 A.2d 15 (1938). In the second category the attorney has by necessity acted tortiously if the abuse of process can be proven. He has signed affidavits and pleadings, and represented to the courts of which he is an officer that his representations and arguments were made in good faith and upon reasonable belief of their truth. Except in the occasion where he has been misled by his client, or he could not upon exercise of due diligence discover the falsity of the representations made by his client, a lawyer may not "[f]ile a suit ... or take other action on behalf of his client when ... such action would serve merely to harass or maliciously injure another." Code of Professional Responsibility DR7–102(A)(1). There is no allegation that Castelbuono has personally effected any abuse of the legal process.

Putting aside, then, those cases in which the lawyer has acted by initiating malicious legal actions on behalf of his client, the Court must consider whether or not the facts of record disclose any action on the part of Castelbuono that might support a triable issue of fact as to his culpable participation in the alleged violations of federal antitrust laws or state laws of tortious interferences with contract and abuse of process.

As it appears from the cases cited by the Court, under Pennsylvania, New York, and federal law, an attorney who is not a stakeholder in the alleged conspiracy must do more than be present at the scene, and, indeed he must do more than merely advise. Particularly in the circumstances of this case, where the proof of the wrongs allegedly carried out by the putative conspiracy depends upon proof of anticompetitive effect (the antitrust claims), intent (the tortious interference with a contract claims), and malice (the abuse of process claims) the law directs the court to be wary of imputing to Castelbuono either the motives of his clients, see *Newburger*, 568 F.2d at 1080 (attorney is "generally not responsible for the motives of his clients"), or extraordinary foresight, e.g. as to anticompetitive effect. Yet, to meet the standard of *Newburger*, he must have acted "maliciously fraudulently, or knowingly to tread upon the legal rights of others," 563 F.2d at 1080. For example, to show his participation in a conspiracy to violate the Sherman Act, plaintiffs would have to prove (1) that Castelbuono knew unequivocally that his clients actions were in violation of the antitrust laws, and, (2) that he actively participated in a way that went beyond his role as an advisor. In reviewing the evidence in that context it is undisputed that Castelbuono represented Semack when the two went to Finland, and at meetings where the parties attempted to resolve the disintegrating situation of MTS, Inc. Plaintiffs make much of Castelbuono's retention of freights paid to MTS, Inc. As mentioned, the Court has heard extensive testimony about the period of time during which MTS, Inc. unravelled, and in the light of the uncertainty that prevailed at the time about the relative rights of the parties, it does not rise to the level of active participation in a conspiracy that Castelbuono, acting at his client's behest, held freight monies to which his client may well have been entitled.

Indeed, the undisputed testimony shows that Castelbuono actively sought direction as to the proper disposition of the freight monies paid to MTS, Inc. In January or early February of 1977, Castelbuono, who had apparently never received any documentation pertaining to First Pennsylvania's claim to the MTS, Inc. freights called Vincent DiPatre at the First Pennsylvania Bank to ask where the checks should be sent. Castelbuono has testified:

I made several requests of Mr. DiPatrie [sic]. I explained to him on the telephone that Mr. Holt had advised us that MTS owed the First Pennsylvania Bank a good deal of money, and that certain assets of MTS, including its accounts receivable, were pledged to the bank and that we had checks payable to MTS which my clients were holding pending a verification that in fact such a pledge existed, and that if he would please provide me with the documents of that arrangement . . . that I would be happy to send the checks to the bank.

We had no wish that any funds that belonged to anyone else but wanted to be sure that we were giving the money to the right person [sic]. He said he would get on it right away and would call me back as soon as possible and no later than the close of business the following Monday.

Q: Did he do so? [Castelbuono]: No, sir, he never called me back, wrote me or did a damned thing, Mr. Holt responded.

Q: What was the nature of his response? [Castelbuono]. 'I told you not to call the bank, who the hell do you think you are,' et certera.

(Deposition of Castelbuono at 452–53).

In addition, the testimony is unrebutted that Castelbuono withheld the freight mo-

nies at Semack and Kavula's direction. (Deposition of Castelbuono at 90).

Castelbuono's delivery to Finnowner's counsel of copies of checks forwarded to First Pennsylvania is similarly not persuasive evidence of Castelbuono's participation in a conspiracy. Indeed Castelbuono could probably have been compelled to produce copies of the checks or manifests[5], and the fact that doing so may not have been in plaintiffs' best interests does not constitute a tortious or fraudulent act as to them.

The Court is fully aware that in analyzing the allegedly conspiratorial participation of Castelbuono it has not followed the analysis offered by movant Austrian. Indeed, it may appear that the Court is ruling on a motion not yet made, but the Court can perceive no benefit in avoiding a necessary analytical step. Before it can analyze the responsibility of Austrian, Lance and Stewart, it must determine that there is a genuine issue of triable fact that Castelbuono exceeded the bounds of the lawyer's privilege to advise his client and act on his behalf. If there is no evidence of Castelbuono's own tortious or fraudulent acts, then the issues of respondeat superior and scope of authority to act are irrelevant.

The Court is also aware that the line drawn here distinguishes conduct on the basis of certain facts and circumstances, and that the rules regarding a lawyer's culpability for his client's misdeeds are ambiguous. Certainly, however, nothing done by Castelbuono rises to the level of a knowing fraudulent act, such as characterized the lawyers' conduct in *Newburger, Benjamin,* or the conduct alleged in *Stein.* There is an important societal interest in protecting the lawyer from third-party lawsuits, and thus in requiring a showing of a knowingly fraudulent or tortious action by the lawyer before permitting third-party recovery from the lawyer. *Cf. D. & C. Textile Corp. v. Rudin,* 41 Misc.2d 916, 918–19, 246 N.Y.S.2d 813, 816–17 (Sup.Ct.1964) ("Even if we assume that the attorneys' conduct if performed by others might constitute inducement to breach of contract, the fact that the attorneys were practicing their profession itself confers a privilege which immunizes them from liability at least on the facts of this case.") A lawyer must be able to act decisively on behalf of his client, without fearing that he will provide "the deep pocket" in subsequent litigation. If his advice and activity are wrong or negligent, he is already exposed by virtue of his duty to his client. In the context of this case, for example, if plaintiffs prevail, Castelbuono may have some cause to fear that certain defendants will proceed against him.

Because the Court finds that the record facts fail to establish the first element of Austrian's liability, that is, activity by Castelbuono that would permit plaintiffs to recover from him as a co-conspirator, it need not reach the issues of vicarious liability, authorization or authority. Accordingly summary judgment will be entered for Austrian.

### 2. Finnowner's Motion to Dismiss

 The Court had previously withheld ruling on Finnowners' motion to dismiss based on lack of personal jurisdiction and insufficiency of service of process.

The Court permitted plaintiffs to take discovery solely on the issues of personal jurisdiction and service of process, which they apparently did not do. Nevertheless, plaintiffs gathered information sufficient to demonstrate (1), that defendants Finnowners have substantial contacts with the United States, and are thus capable of being sued, under federal law, in this district, and (2) that Rule 4 of the Federal Rules of Civil Procedure has been satisfied with regard to service over a foreign corporation. *Centronics Data Computer Corp. v. Mannesmann, A.G.,* 432 F.Supp. 659 (D.N.H.1977) and F.R.Civ.P. 4(i)(1)(E). Defendants' ships have made frequent calls at American ports, and thus are subject to the jurisdic-

---

**5.** *See* Honan Deposition at 18. In fact Honan could have obtained the same information else- where. Honan Deposition at 55.

tion of American federal courts. Affidavits and exhibits demonstrate that service of process adequate under the alternative provisions of F.R.Civ.P. 4(i)(1)(A–E) has been effected.

3. Discovery

The Court is well aware that this case, or most of it, began in the *Realco* litigation, and that an enormous amount of discovery has been taken. Counsel will be directed to assess their discovery and to prepare for submission on proposed final pretrial schedule.