**WORLDWIDE MARINE TRADING CORP., et al.**

v.

**MARINE TRANSPORT SERVICES, INC., et al.**

**T & L LEASING, INC. and Ocean Systems, Inc. a/k/a Cargo Systems, Inc.**

v.

**MARINE TRANSPORT SERVICES, INC., et al.**

Civ. A. Nos. 80–1909, 80–4341.

United States District Court, E. D. Pennsylvania.

July 2, 1982.

Arnold Levin, Philadelphia, Pa., for plaintiffs.

Barry Ungar, Philadelphia, Pa., for defendants.

## MEMORANDUM

NEWCOMER, District Judge.

Defendants Paul Semack ("Semack"), John Kavula ("Kavula") and MTS Agencies, Inc. ("Agencies") move for summary judgment in this antitrust, malicious prosecution, and intentional interference with contractual relations case.

I have recounted the underlying story of this case on numerous occasions,[1] and yet another recitation of all the facts alleged and the causes of action averred would be an unnecessary task.[2] Nevertheless, in the interests of clarity I will restate briefly the allegations. Plaintiffs Worldwide Marine Trading Corporation ("Worldwide") and Gloucester Shipping Corporation ("Gloucester") allege that the moving defendants conspired with certain Finish shipowners ("the Finnowners") to harm Gloucester and Worldwide in violation of section one of the Sherman Act, 15 U.S.C. § 1 (1976), (Counts I and III); tortiously interfered with Gloucester and Worldwide's contracts to charter two ships (Count II); and tortiously interfered with Gloucester, Worldwide and other plaintiff's contractual relationship with the First Pennsylvania Bank (Count IV). I will consider first the effect of the releases allegedly given by defendants.

1. *The Releases.*

Defendants argue that certain releases, executed May 6, 1977 bar plaintiffs' prosecution of all claims in this case. The release agreement (D. Exh. 46) is an elaborate document, attached to which are form releases from B. H. Sobelman & Co., Inc., Holt Motor Express, Inc., Holt Hauling and Warehousing Systems, Inc., Holt Marine Terminal, Inc., Waterside Ocean Navigation, Inc. of Pennsylvania, Marine Transport, Inc., Gloucester Shipping Corporation, Worldwide Marine Trading Corporation, and Thomas J. Holt to, among others, Paul Semack, John Kavula and MTS Agencies, Inc. The releases are

"from all actions, causes of actions, suits, debts ... claims and demands whatsoever, in law, admiralty or equity, which against the RELEASE, the RELEASOR ... ever had, now have or hereafter can shall or may, have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this RELEASE."

Typed in each of the releases after that broad, boilerplate language is the following language:

except for the obligations of Releasee to the Releasor under a certain agreement dated May 6, 1977, among [the parties] and if, and only if an arbitration award or court judgment shall find Thomas J. Holt personally liable ... to pay damages for breach [of certain charter parties] ... and Thomas J. Holt shall pay such award or judgment, then this release shall not bar a suit by Thomas J. Holt against Paul Semack or John Kavula for

---

1. *E.g. Worldwide Marine Trading Cor., et al. v. Marine Transport Service, Inc., et al.*, 527 F.Supp. 581, (E.D.Pa.1981) (Order, *inter alia* granting defendant Austrian, Lance and Stewart P. C.'s Motion for Summary Judgment); *Id.*, Civil Actions 80–1909, 80–4341 (E.D.Pa. July 16, 1981) (Order denying certain defendants motions to dismiss); *Realco Services, Inc. v. Holt, et al.*, 513 F.Supp. 435 (E.D.Pa.) aff'd 671 F.2d 495, 496 (1981); *Id.* 479 F.Supp. 867 (E.D. Pa.1979); *Id.* 479 F.Supp. 880 (E.D.Pa.1979).

2. In fact this case, and its related case, *Realco*, remind me of another protracted lawsuit:

Jarndyce and Jarndyce drones on. This scarecrow of a suit has, in course of time, become so complicated that no man alive knows what it means. The parties to it understand it least, but it has been observed that no two Chancery lawyers can talk about it for five minutes without coming to a total disagreement as to all the premises.

C. Dickens, Bleak House 17–18 (1959 ed.).

the damages paid which are attributable to a breach wrongfully caused by Paul Semack or John Kavula, and except for claims for return of funds of Marine Transport Service, Inc. diverted in bad faith and not used in the business of Marine Transport Service, Inc.

(D. Exh. 46). Without question, the language of these releases is broad enough to embrace the claims asserted here: Counts I, III (antitrust) and IV (tortious interference with banking relationships) are clearly within the terms of the release. Count II seeks damages for an interference with the charter-parties, a claim which can be asserted by the terms of the release only if Thomas J. Holt is found "personally liable" for damages for breach of the charter-parties and he "shall pay such award or judgment." No such award or judgment exists, so Count II is also a "released" claim.

Plaintiffs argue first that defendants behaved in a manner that breached the release agreements, rendering them void, and second that the releases should have no effect because they were obtained through fraudulent inducement and were therefore never effective.

The actions of defendants after May 6, 1977 were by plaintiffs' characterization part of "a plan which had already started prior to the May agreement and prior to the execution of the releases." Plaintiffs' Memorandum at 14. In order to avoid the effect of the releases on these claims on the basis of defendants' activities *after* May 6, 1977, plaintiffs must prove a material breach of the May 6 agreement to which the releases were appended. To that end the plaintiffs allege that defendants urged creditors of MTS, Inc. to sue defendants, they "continued to allow default judgments to be taken" against MTS, Inc. and they "did not even afford the creditors of MTS the benefit of insurance believed to be in being ... which would cover these losses." Plaintiffs' Memorandum at 15. By contrast, the summary of defendants compliance with the May 6 agreement is a long one. An abbreviated list includes the following: Semack and Kavula honored their

obligations (1) to assign to First Pennsylvania Bank all of their rights to the assets of MTS, Inc. *See* Exh. 46 ¶ 4); (2) to deliver to plaintiffs Worldwide and Gloucester a manifest and Bills of lading from the Finn Builder (*See* D. Exh. 46 ¶ 6); and (3) to deliver to Thomas Holt's attorneys certain freight monies, (*See*, D. Exh. 46 ¶¶ 6, 8). Defendants have enumerated six other substantial acts of compliance, and these are unrebutted by plaintiffs.

On this record, which is huge, I fail to see any material issue of fact warranting a trial. The May 6 Agreement and the releases formed a contract with which defendants complied. Plaintiffs argue that Semack and Kavula did not "co-operate in the collection of all contingent assets of MTS but rather frustrated the same" by sending copies of certain freight checks which they had held before May 6 to the attorney for the checks' issuers, the Finnowners. *See Worldwide Marine Trading*, 527 F.Supp. at 586. Apparently, plaintiffs consider this a breach of defendants' promise "to cooperate fully ... in the collection of all claims and contingent assets of MTS, Inc. and of all the claims by or against the Charterers [Worldwide and Gloucester] used in the carriage of MTS cargo." (D. Exh. 46 ¶ 10). As I have noted before in this case, the Finnowners could have compelled production of the copies of the checks, but, more importantly I cannot infer from the May 6 agreement a covenant on the part of Semack and Kavula to cooperate in Worldwide and Gloucester's efforts to evade creditors. Quite clearly, Semack and Kavula were obliged to cooperate in the *collection* of all claims, and in transmitting the checks they fulfilled that obligation. The other allegations, that defendants directed inquiries about MTS, Inc. to plaintiffs, or that "they continued to allow default judgments to be taken against MTS," or even that they advised creditors to sue plaintiffs do not amount to a breach of any obligation express or implicit arising out of the May 6 agreement. Certainly, on this record, which shows complete performance by defendants of their explicit duties, I can

see no evidence of a material breach of the May 6 agreement sufficient to avoid the effect of the releases and permit a trial.

■ Plaintiffs further argue that they were fraudulently induced to execute the releases, and that the releases were therefore void *ab initio*. The fraud alleged is the previously mentioned "plan" to suggest that creditors of MTS, Inc. sue plaintiffs, and to frustrate plaintiff's transfer of MTS's receivable to First Pennsylvania. Defendants have demonstrated that the record shows that Thomas Holt believed that "there was a conspiracy between [defendants] and the ship owners to take the ships from Waterside before the charters matured" and that *before* May 6 Holt "wanted to reserve the right to sue MTS and its officers for conspiracy, breach of contract, and possible fraud and conversion." (D. Exh. 49). No such reservation was made in the releases.[3] Similarly, Holt has testified in court that the checks purportedly assigned to First Pennsylvania were withheld beginning in late March 1977 and that "it was obvious from the very start that the two gentlemen from Marine Transport Service were attempting to break the charter agreement that we have with the owners on this vessel and another vessel." Defendant's Memorandum at 37 (quoting Notes of Testimony, May 1977 Philadelphia Court of Common Pleas). Given this state of Holt's awareness before May 6, 1977, and absolutely no evidence of any contrary reassurances from defendants, the releases must be given their full effect as to all defendants and against all plaintiffs.[4] He and the corporate plaintiffs are now suing defendants on account of things defendants did before May 6, and about which plaintiffs knew. Therefore, I must conclude that all the evidence of record

shows that the parties intended to release one another from all claims arising out of the MTS, Inc. misadventure. There is no evidence to the contrary suggesting a triable issue of fact. F.R.C.P. 56(e).

In sum, the parties agreed to release one another from all claims, and there appears to be no sound reason not to give effect to that agreement.[5]

### 2. The Antitrust Claims.

■ Although a general release is effective for antitrust claims, *Three Rivers Motor Company*, 522 F.2d at 896 n.27, summary judgment is also independently appropriate on the antitrust claims.

#### a. Standard of Review.

■ Although there is a special reluctance to grant summary judgment in an antitrust case, *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Hambro v. Shell Oil Co.*, 674 F.2d 784, 786 (9th Cir. 1982), that reluctance can be overcome when it can be shown unmistakably that defendants are "entitled" to summary judgment, F.R.Civ.P. 56(c), because plaintiffs have failed "to set forth specific facts showing that there is a genuine issue for trial." F.R.Civ.P. 56(e); *Boulware v. Parker*, 457 F.2d 450 (3d Cir. 1972). Indeed one judge of this Court has identified an "efficiency" interest in permitting judgment on the pleadings in an antitrust case, where one party is entitled to that judgment. *Cardio-Medical Associates, Ltd. et al. v. Crozer-Chester Medical Center*, 536 F.Supp. 1065, [1982–1] Trade Cases ¶ 64,614 (CCH) (E.D. Pa.1982) (Lord, C. J.). In this case, and its related cases, *see* note 1, *supra*, there has

---

**3.** In fact, the exhibit demonstrates that Holt was advised by First Pennsylvania to "forget about" any such lawsuit.

**4.** That Thomas Holt's knowledge reflects the "knowledge" of the plaintiff corporations is clear from the fact of his involvement or control over the corporate plaintiffs. *See Realco Services v. Holt*, 513 F.Supp. 435, 436–37 (E.D. Pa.1980).

**5.** I note that in this case there was manifested a clear "intent to settle all accounts" and that the releases could be given full effect "even as to unknown claims." *Three Rivers Motors Company v. Ford Motor Company*, 522 F.2d 885, 896 (3d Cir. 1975). Having decided that the uncontroverted evidence shows that the claims were not unknown, I need not give the releases this broad effect.

been extensive, indeed voluminous discovery. Every conceivable witness has been deposed, and mountains of documents have been produced, photocopied, marked and filed. In fact plaintiffs have requested that I withhold my ruling on this motion until Kieron Quinn, Esq., former counsel for the *Realco* plaintiffs is deposed, *see* note 1 *supra*, and I have done so. I will not, however, wait until full discovery is taken of Finnowners. Summary judgment is appropriate now, and it will be entered. *See Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 672 (9th Cir. 1980).

b. The Elements of Antitrust: Relevant Market, Anti-Competitive Effect, Conspiracy.

■ As I have noted before, this is a rule of reason case, and the summary judgment motion is an appropriate test of plaintiffs evidence of a "contract, combination . . . or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1 (1976). Once defendants can show that record evidence does not support plaintiffs' claims, the burden shifts to plaintiffs to show that their "version of the facts [would] support a legal theory which would entitle them, if accepted, to a judgment as a matter of law." *Mutual Funds Investors v. Putnam Management Co.*, 553 F.2d 620 (9th Cir. 1977).

(1) The Relevant Market.

■ Plaintiffs allege an anticompetitive effect in the market of charterers, sub-charterers, potential charterers, and sub-charterers of Roll-In Roll-Off cargo vessels ("Ro-Ro vessels") for use in the traffic between the East coast and Gulf ports of the United States and ports in the Persian Gulf.[6] Defendants dispute the geographical limitation of this market, but argue that even if the court accepts the relevant market as defined by plaintiffs, defendants are still entitled to summary judgment.[7] I agree, and therefore need not decide whether or not the relevant market as defined by plaintiffs is too narrow as a matter of law.

(2) Anti-competitive Effect.

■ Plaintiffs allege that in 1977 there were three companies "servicing the Middle East with Ro-Ro vessels from the East coast," Plaintiffs' Memorandum at 17, and that defendants actions "eliminating Worldwide and Gloucester from operating increased the concentration in the relevant market." *Id.*

The evidence of record is flatly to the contrary. Worldwide and Gloucester each chartered only one ship. When the charters were lifted, the ships were operated by new charterers in the same Gulf Coast to Middle East trade routes.[8] Thus, assuming that plaintiffs' allegations are true, and that defendants conspired to remove the Finn-Amer and the Finn-Builder from Worldwide and Gloucester, a new charterer appeared on the scene and the ships were operated as before.[9] Accordingly as a mat-

---

6. The "relevant market" is the frame within which the alleged anti-competitive effect of defendants actions is measured. There are both product and geographic parameters, which taken together define the "area of effective competition." *Brown Shoe v. United States*, 370 U.S. 294, 336, 82 S.Ct. 1502, 1529, 8 L.Ed.2d 510 (1962).

7. Defendants initially argued that the product market might be Ro-Ro vessels, but that a geographical limitation was nonsensical. Defendants argue, quite convincingly, that the ship charters here, and ship charters generally do not contain limitations on the geographical use of the ships, except for war zones and the like, and that the "area of effective competition was thus worldwide."

8. The charters were lifted April 26, 1977 (Finn-Amer) and May 6, 1977 (Finn-Builder). By the end of May, 1977 the ships, renamed the Concordia-Amer and the Concordia-Builder, were engaged in sailing between Saudi Arabian ports and eastern and Gulf Coast American ports. (Semack Aff. ¶ 6).

9. The three companies in the market defined by plaintiffs were identified by plaintiffs as Worldwide, Gloucester and Hansa. Plaintiffs Answer to Interrogatory 53(a) (Set II). Concordia, which assumed Finn-Amer and Finn-Builder's charters, must then have been a new entrant. I note again that Worldwide and Gloucester each operated only one ship, and they apparently intended to allow the charters to lapse in June 1977, *see* D. Exh. 49. Hansa Lines, on the other hand is an ancient and enormous ship-

ter of law, I must conclude that there was no effect on competition whatsoever, much less a "substantially adverse effect." *United States v. Arnold Schwinn & Co.*, 388 U.S. 365, 375, 87 S.Ct. 1856, 1863, 18 L.Ed.2d 1249 (1967). The only change in the market was that two corporations appear to have been replaced quite readily by one—a change of form rather than substance, because those two corporations were in fact owned by one person, Thomas J. Holt. *Realco*, 513 F.Supp. at 437.

The immediate entrance of a new competitor into the relevant market, as it is defined by plaintiffs, suggests two things. First, the relevant market definition is improperly narrow. Second, there are insubstantial barriers to entry to this relevant market. Judging by the rapidity with which Gloucester and Worldwide were replaced by Concordia, operating the same ships, I must conclude that as a matter of law the change in concentration, if any, in the relevant market had an inconsequential effect. *See United States v. United Shoe Mach. Corp.*, 110 F.Supp. 295 (D.Mass.1953) aff'd per curiam 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954); L. Sullivan, Handbook of The Laws of Antitrust 77 (1977). Where it is alleged that there are three competitors in a market, each with an unstated market share, and the evidence shows that the two allegedly injured competitors were immediately replaced by a new competitor who carried out precisely the same business as the injured competitors, and there is no other evidence adduced, there can be no triable issue of anti-competitive effect. *Cf. United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 531–32, 93 S.Ct. 1096, 1099–1100, 35 L.Ed.2d 475 (1973).

(3) Conspiracy.

▮  Defendants argue, finally, that the antitrust counts fail because there is inadequate record evidence of a "contract, combination ... or conspiracy." Defendants argue that at most plaintiffs have alleged

"conscious parallelism," *see Schoenkopf v. Brown & Williamson Tobacco Corp.*, 637 F.2d 205, 208 (3d Cir. 1980). Plaintiffs assert that the following acts are circumstantial evidence of agreement: (1) Semack and Kavula withheld freight funds assigned to First Pennsylvania; (2) the Finnowners lifted the charters on April 26, 1977 and May 6, 1977, *See* note 8 *supra*. (3) Semack, Castelbuono (Semack's lawyer) and the Finns met on April 28, 1977, and during the meeting they discussed the possibility of Semack and Kavula taking over the charters for the Finn-Amer and the Finn-Builder; (Semack and Kavula did not take over the charters); (4) Castelbuono and Semack gave the Finnish defendants "an April 26 draft of the May 2 agreement thereby telegraphing to the Finns the fact that Worldwide and Gloucester had financial problems" Plaintiffs' Memorandum at 19; and, (5) Defendants, some or all of them, suggested that creditors of MTS, Inc. sue the plaintiffs.

Defendants argue that there is no evidence of an agreement among Semack, Kavula and the Finnowners to cause the Finn-Amer and Finn-Builder charters to be lifted. It is evidence of that agreement which is lacking in this case. As one commentator has stated, this evidence is critical.

> The concrete question often litigated is whether there is sufficient evidence of an agreement to be submitted to a jury or to sustain a jury finding [of agreement]. Some litigants and courts seem to think that they can answer that question without first defining the nature of the agreement that amounts to a statutory contract, combination or conspiracy. It is sometimes said that an admitted fact X does not compel a finding of agreement but is sufficient for such a finding by a jury.... It will often turn out that the connection between X and any conclusion is entirely speculative.

P. Areeda, Antitrust Analysis 350–51 (1981). I conclude that the record facts of this case

ping line. Although I need not consider this factor, it seems unlikely that plaintiffs could show any considerable change in the "concen-

tration" in the relevant market by virtue of Worldwide's and Gloucester's disappearance.

are not utterly inconsistent with a finding of conspiracy to harm Worldwide and Gloucester, but they are inadequate for the purpose of suggesting a genuine issue of material fact for a jury to consider.

Plaintiffs continually allege and argue that Semack, Kavula and the Finnowners agree to carry out a series of acts to drive Worldwide and Gloucester out of the business of chartering the Finn-Amer and the Finn-Builder. Certainly the facts recited above are not evidence of any such agreement. The record evidence shows only that the Finnowners wished to terminate their business relationship with Thomas J. Holt and the companies that he controlled. There is no evidence that Semack and Kavula ever agreed to do anything to help them accomplish this purpose. Indeed the record evidence is that Semack and Kavula had their own interest in retaining the freight checks: they expected the money earned by MTS-operated ships to be used in part to pay MTS's creditors and to meet MTS's payroll expenses. (Semack Affidavit ¶ 9; Def. Exh. 4, 6). The facts are that the Finnowners, Semack and Kavula all had business disputes with Thomas Holt and the companies he controlled. There is simply inadequate evidence to support a reasonable inference that they also joined together to conspire to harm Worldwide and Gloucester. Plaintiffs offer evidence to show that the defendants met, and that Finnowners wanted to transfer their business to Semack and Kavula, but this meeting occurred *after* one of the charters had been lifted. I cannot permit a jury to speculate about an agreement when there is no evidence of one.

I cannot agree with defendants that this is a "conscious parallelism" case, *see Interstate Circuit Inc. v. United States,* 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939); *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434 (3d Cir. 1977) *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), because Semack

and Kavula on the one hand and the Finnowners on the other are not competitors. *See* L. Sullivan, Handbook of the Law of Antitrust, 317 (1977), Turner, *The Definition of Agreement under the Sherman Act: Conscious Parallelism and Refusals to Deal,* 75 Harv.L.Rev. 655, 697–70 (1962). Therefore, the "plus factor analysis", *C–O Two Fire Equip. Co. v. United States,* 197 F.2d 489 (9th Cir.) *cert. denied* 344 U.S. 892, 73 S.Ct. 211, 97 L.Ed. 690 (1952); *accord Bogosian,* 561 F.2d at 446, is not, strictly speaking, applicable. Nevertheless, it is instructive, and under the circumstances of this case it is appropriate that plaintiffs be required to show evidence of "acts by defendants in contradiction of their own economic interests ..., and ... motivation to enter an agreement." *Bogosian,* 561 F.2d at 446; *Pan-Islamic Trade Corp. v. Exxon,* 632 F.2d 539, 558–564 (5th Cir. 1980). Because there is no evidence of a motivation to enter an agreement to harm Worldwide and Gloucester, and because the evidence shows an independent and preexisting desire on the part of the Finnowners to stop doing business with Holt,[10] I can conclude that insufficient record evidence has been identified by plaintiffs to permit a trial on the issue of conspiracy.

3. *Tortious Interference With Contractual Relations*

In Count II plaintiffs allege tortious interference with the charter parties for the Finn-Amer and the Finn-Builder. In Count IV plaintiffs allege tortious interference with plaintiffs' financing agreement with First Pennsylvania. As noted, these claims are barred by the releases discussed in 1 *supra.* However, defendants argue that the allegations of Counts II and IV are barred for other reasons as well. I will discuss one of them, the statute of limitations bar, separately.

---

**10.** The record shows disputes between the Finnowners on one side and Thomas J. Holt, through Worldwide and Gloucester, on the other beginning in May 1976. In fact the Finns won arbitration awards from Worldwide and Gloucester on October 8, 1979 (E. Exhs. 51, 52). The amounts recovered included $14,585.33 for an unauthorized deduction from the hire payment, made in May 1976.

a. Statute of Limitations.

Defendants argue that both Counts II and IV are barred by the two-year Pennsylvania Statute of Limitations, Pa.Cons.Stat. Ann. tit. 42 § 5524(3), because both alleged interferences occurred in 1977. I agree with defendants that no theory of equitable tolling applies here. It is less clear, however, that the Pennsylvania law of limitations applies.

As a court sitting in admiralty, at least with respect to Count II if not Count IV,[11] the task is to choose the statute of limitations of the state whose interest in the outcome is the greatest. Put differently, I must look to the law of the state with the most significant contacts to the transactions which are the basis of the lawsuit. The range of choices includes New York and New Jersey, each of which has a six-year statute of limitations, and Pennsylvania.

The facts adduced at the *Realco* trial showed that Gloucester and Worldwide were operated mostly from New Jersey. On the other hand, the alleged tort consisted of failing to remit freight checks to Philadelphia. Furthermore, Gloucester and Worldwide, which are owned entirely by Thomas J. Holt, are Liberian corporations, and Holt is a resident of Pennsylvania. *Realco*, 513 F.Supp. at 437. Semack, Kavula and MTS, Agencies do business in New York, and Semack and Kavula both live in New York.

Because the locus of the alleged tort is difficult to determine, I must look to the focus of the injury. Gloucester and Worldwide are Liberian corporations, but their sole shareholder lives in Philadelphia, and their financial business was apparently exclusively in Philadelphia. Plaintiffs have filed documents showing that Gloucester and Worldwide's directors and stockholders meetings were held in New Jersey and New York, and that the corporation had offices in New Jersey. Corporate offices and meetings can be located almost anywhere, and I find such evidence to be of little help in deciding which state has the most significant relationship to the parties. The charter-parties in question were among Finnish shipowners and Liberian corporations. The American contacts with the contract were through the sole shareholder of the charters, who lives in Philadelphia, the bank where the charter-parties were financed, which is in Philadelphia, and the offices of the Liberian corporations, which were in New Jersey. On balance, I must conclude that the state with the most significant interests in these charter-parties is Pennsylvania. Accordingly, suit having been filed in 1980 the claim alleged in Count II which arose in 1977 is barred by the two-year statute of limitations.

The choice of law issue is even murkier with regard to Count IV, however. As I have noted earlier, the plaintiffs *other* than the Liberian corporations stated cognizable claims against defendants because they were the guarantors of the loans to MTS, Inc. *Worldwide Marine Trading v. MTS, Inc.*, Civil Actions 80–1909, 80–4341 at 6 (E.D.Pa. July 16, 1981) (Memorandum and Order Denying Motion to Dismiss). Waterside Ocean Navigation, Inc., B. H. Sobelman & Co., and Holt Hauling and Warehousing Systems, Inc. are Pennsylvania corporations. All except B. H. Sobelman & Co. have their offices in New Jersey. Holt Marine Terminals is a New Jersey corporation with its offices in New Jersey. Holt Motor Express is a Delaware corporation with its offices in New Jersey. They are all guarantors of a loan to MTS, Inc., a New Jersey corporation, from First Pennsylvania Bank in Philadelphia.

Again, I conclude that the focus of the case is in Pennsylvania. The contract was

---

11. Count II alleges interference with contracts, or charter-parties, governing the use of ships. This Count is clearly within the admiralty jurisdiction of this court. *Moorewood v. Enequist*, 23 How. 491, 16 L.Ed. 516 (1859); 7A J. Moore, Moore's Federal Practice ¶ .245[1] at 2973 (2d ed. 1979). Count IV relates to the financing of two shipping companies. The maritime nexus is tenuous at best in that circumstance, even though the sole purpose of the financed companies was to charter ships.

drawn in Philadelphia and the source of the financing was in Philadelphia. Some of the allegedly harmed guarantors are Pennsylvania corporations, one is a New Jersey corporation, and one is a Delaware corporation.

Because the Pennsylvania limitations period is the appropriate one to apply, I must conclude that the causes of action alleged in Counts II and IV are time-barred.

4. *Conclusion.*

Having decided that the moving defendants are entitled to summary judgment for several reasons, I need not consider the additional arguments made by them. Summary judgment is appropriate now, and an order consistent with this memorandum will be entered.