**ASTARTE, INC. and Pacific Separator Manufacturing, Inc., Plaintiffs,**

v.

**PACIFIC INDUSTRIAL SYSTEMS, INC., Sydney Edward ("Ted") Tilby, Scott Marshall, Operadora Azucarera Del Pacifico, S.A. de C.V., and Estructuras, Plantas Y Asesoria Industrial Azucarera, S.A., de C.V., Defendants,**

v.

**Aron KATZ, William Pearlman, Phyllis Katz, Martin Katz, Margaret Katz and Sugartree, Inc., and Pacific Separator, Inc., Additional Parties to the Counterclaim.**

Civ. A. No. 92–F–1363.

United States District Court, D. Colorado.

Feb. 17, 1994.

failure, the court shall extend the time for service for an appropriate period. . . .

John F. Head, John F. Head, P.C., Denver, CO, Patrick F. McManemin, E. Bruce Bushong, Donna R. Morris, McManemin & Smith, P.C., Dallas, TX, Joseph P. McMahon, Jr., Davis, Graham & Stubbs, Denver, CO, for plaintiffs.

George Mueller, Burns, Wall, Smith & Mueller, Denver, CO, John D. Phillips, Hall & Evans, Denver, CO, for defendants.

Micheal W. Sutton, Boulder, CO, for additional parties on the counterclaim.

## ORDER REGARDING DEFENDANT SCOTT MARSHALL

SHERMAN G. FINESILVER, Chief Judge.

This case involves alleged breach of contract and breach of fiduciary duty arising out of an agreement to license and operate certain sugar cane processing systems. Jurisdiction is based on 28 U.S.C. § 1332 (West Supp.1992). This matter proceeded to a trial before the Court. The only remaining Defendant at the time of trial is Scott Marshall. The Court has carefully considered all of the evidence presented, the testimony of the witnesses, and the applicable law. The following constitutes the Court's findings of fact and conclusions of law required by FED. R.CIV.P. 52(a).[1] For the reasons stated below, the Court finds the issues in favor of the defendant and against the plaintiffs.

### I. Findings Of Fact

#### A. Parties

1. Pacific Separator Manufacturing, Inc. ("PSMI") is a Colorado corporation.

2. Astarte, Inc. ("Astarte") is a Colorado corporation.

3. Pacific Industrial Systems, Inc. ("PIS") is a Canadian corporation.

4. Sydney Edward Tilby ("Ted Tilby") is a resident of Victoria, British Columbia.

5. Scott Marshall ("Marshall") is a resident of Victoria, British Columbia.

6. Operadora Azucarera del Pacifico, S.A. de C.V. ("Operadora") is a company incorporated in Mexico. Operadora has been served and is in default.

7. Estructuras, Plantas y Asesoria Industrial Azucarera, S.A. de C.V. ("Plantas") is a company incorporated in Mexico. Plantas has been served and is in default.

8. Aron Katz ("Katz"), Phyllis Katz ("Ms. Katz") and William Pearlman ("Pearlman") are each residents of Boulder, Colorado.

9. Pacific Separator, Inc. ("PSI") is a Colorado corporation.

10. Sugartree, Inc. ("Sugartree") is a Colorado corporation.

11. The "Astarte Group", as used herein, refers collectively to Astarte, Inc., the Katz family, and William H. Pearlman.

#### B. Background Facts

Plaintiff Astarte and Defendant PIS are each 50% shareholders in Plaintiff PSMI. PSMI's Board of Directors consists of William Pearlman, Phyllis Katz (both selected by Astarte), and Defendants Marshall and Tilby (both selected by PIS). Ms. Katz is the Chief Executive Officer and Chairperson of the Board of PSMI.

This case originally involved two primary areas of dispute. The first area of claims related to a matter of contract interpretation to determine what rights PSMI had with respect to the Tilby Technology (which consists of the technology and patents underlying the Tilby System, together with the ability to develop related technology and to sell the products and by-products), pursuant to the May 18, 1990 Agreement (the "Central Agreement"), the Memoranda of Exclusive Licenses Granted dated January 2, 1991 (the "Assignment") or the License dated August 1, 1990 but executed in May 1991 (the "License"), including (i) ownership of the patents by virtue of the execution of the Assignments and (ii) the right of PIS to terminate the License.

The second area of claims related to the breach of fiduciary obligations and usurpation of corporate opportunities, in a conspiracy between Defendant Marshall, PIS, a number of PSMI senior officers, and their new business partners to (i) create and cause the insolvency of PSMI to terminate the License, and (ii) create and implement a scenario to

---

1. FED.R.CIV.P. 52(a) states, in pertinent part, that "[i]n all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon and judgment shall be entered pursuant to Rule 58." FED.R.CIV.P. 52(a).

steal business opportunities and the Tilby Technology away from PSMI.

The weekend before the trial of this case, the claims against PIS and Tilby, as well as all counterclaims against PSMI, PSI, Sugartree, and the Astarte Group were settled. As a result, this case went to trial only as to claims against Marshall. As most of the claims against Marshall arise out of the same facts and circumstances as the claims against PIS and Tilby, these findings address the relevant aspects of the PIS–PSMI relationship.

## C. Findings of Fact

1. For thousands of years sugar has been extracted from sugar cane by crushing the entire cane stalk. The cane stalk includes hard fiber, and thus the extraction process is inefficient and has an average recovery of only 85% of the sugar juice. This sugar juice is highly contaminated with fiber and dirt. The conventional extraction process is expensive because it requires a great deal of power to crush hard fiber and because of the requirement of an extensive purification process. Most important, the only significant product of the conventional process is the sugar; the balance is a waste product, called bagasse, consisting of mangled hard fiber, soft fiber, dirt and residual sugar.

2. In the early 1970's, Ted Tilby invented a new system for the processing of sugar cane (the "Tilby System"). The Tilby System is a technique for processing sugar cane that extracts substantially more of the sugar product than any previous process. This system also produces by-product material which can be used to create substitute and simulated wood products such as wallboards or pressboards. The Tilby System was invented by Ted Tilby and was licensed to PIS, a Canadian company, in 1988 (the "Tilby License").

3. The Tilby System is intended to revolutionize the traditional methods. Rather than crushing the whole cane, the Tilby System separates the cane into the hard outer fiber, and the soft inner fiber in which the sugar juice is embedded. It then squeezes the soft fiber to remove the sugar juice. Instead of recovering 85% of impure sugar juice, there is a recovery of 95% of pure juice. In sum, the Tilby System can process a higher volume of sugar cane, with a higher percentage of pure juice recovered and, as well, operate in a more efficient and less expensive manner.

4. At the time of the inception of the relationship between the parties to this litigation, however, the Tilby technology had never been operated on a commercially viable basis.

5. One of the plaintiffs, Astarte, Inc., a Colorado corporation, is a family corporation owned and controlled by members of the Katz family and their business associate, William Pearlman. Aron Katz ("Katz") is the financial decision-maker of the Katz family and no other member of the family appeared or testified at trial.

6. The other plaintiff is Pacific Separator Manufacturing, Inc. ("PSMI"), a Colorado corporation, which is owned 50% by the Katz family and 50% by defendant Pacific Industrial System, Inc. ("PIS").

7. PIS was incorporated in July 1988 by Tilby and William Jubb. The majority shareholder of PIS is a holding company jointly owned by Tilby and his wife. Other shareholders include: Jubb, the president of PIS; defendant Marshall, who owns less than one percent of the shares of PIS; and independent investors who put investment capital into PIS.

8. By Agreement dated November 5, 1988, Tilby licensed to PIS certain inventions and improvements to the Tilby technology in which he had a proprietary interest.

9. Defendant Marshall is licensed to practice law in British Columbia and has been Tilby's lawyer since at least 1979, and has represented PIS since its formation.

10. In 1989, PIS entered into a preliminary agreement with Patrick Patton, a businessman in Mexico, and his associates, for PIS to manufacture and install a pilot plant in Mexico to process sugar cane. Patton had represented that he could obtain financing from Mexican banks and institutions.

11. PIS was also looking for a joint venture partner with the ability to invest or

raise capital and to provide administrative know-how to develop the Tilby technology worldwide.

12. In early 1990, Patton described the Tilby technology to Katz. As a result, Katz travelled to Victoria, British Columbia, and met with Tilby and Jubb, after having retained David Jansson, then a professor at Texas A & M, to assess the potential of the Tilby technology. Jansson was subsequently retained by Katz to serve as the president of PSMI.

13. Astarte, PIS, Patton, and Tilby entered into a Letter Agreement dated May 18, 1990. The agreement provided for the purchase of an existing sugar mill in Mexico by a Mexican entity to be owned 1/3 each by the Mexican group, the Katz interests, and PIS, and the manufacture and installation of a pilot plant by PIS. The purchase of the existing mill and the pilot plant was to be financed by a capital injection from Astarte and loans from Mexican banks.

14. The agreement called for the formation of a corporation—ultimately PSMI—to be owned 50% by Astarte and 50% by PIS for the purpose of receiving an exclusive sub-license of all of the rights licensed by Tilby to PIS to develop the Tilby technology on a worldwide basis. The agreement provided that the shareholders of PSMI would vote their shares so that PSMI at all times had a four member board of directors, at least two of whom had been selected by Astarte and two of whom had been selected by PIS, and that at all times the chief executive officer would be an individual selected by Astarte.

15. The agreement also provided that Astarte, among other things, would be responsible for obtaining necessary loans or investments funds for establishing the operations of PSMI.

16. Marshall continued to act as attorney for PIS in other matters arising out of the agreement. He drafted the Sub–License agreement from PIS to PSMI, the consulting agreement between Tilby and PSMI, and the shareholder agreements for PSMI and the Mexican entities. In addition to acting as attorney for PIS, Marshall at times acted as an attorney for PSMI and the Tilbys', both father and son, generally on purely local matters in Victoria. For example, he acted as PSMI's attorney with regard to leasing the premises for PSMI's Victoria office and, later in 1992, by dealing with attorneys who were representing Canadian creditors of PSMI. The activity on behalf of these named individuals and business entity was known to Katz and his business associates.

17. Throughout the course of the relationship between the parties, Marshall maintained his private practice of law in British Columbia, representing clients other than PIS.

18. The August 7, 1990 Shareholders Agreement of PSMI identifies the shareholders of PSMI as PIS, Phyllis Katz, Martin J. Katz, Margaret E. Katz, and William Pearlman. In ¶ 2 of the Shareholders Agreement, the shareholders of PSMI agreed that they would vote their shares to assure that the board of directors was composed of four members, two persons nominated by PIS and two persons nominated by the Katz group.

19. Pursuant to the provisions of the May 1990 Letter Agreement, and the August 1990 Shareholders Agreement, Ted Tilby and Jubb were appointed as representatives of PIS on the PSMI board of directors. Tilby and Jubb were the only two directors of PIS, and Katz was aware of this matter.

20. Phyllis Katz and Pearlman were the board members of PSMI selected by Astarte. However, Aron Katz was, as a practical matter, the chief executive officer of PSMI, and held himself out at times as the Chairman of the Board of PSMI. Katz was a spokesperson on behalf of PSMI, Astarte, and the Katz family.

21. By Sub–License Agreement dated August 1, 1990, PIS granted to PSMI an exclusive sub-license of certain new inventions and improvements pertaining to the sugar cane processing system, consistent with the scope of the license granted by Tilby to PIS. Paragraph 9.2 of the Sub–License Agreement provides, in pertinent part, that "PIS may at it's [sic] option forthwith terminate this Agreement if ... PSMI becomes bankrupt or insolvent ..." The Sub–License Agreement further provides that the

Agreement shall be interpreted in accordance with the laws of the Province of British Columbia.

22. In approximately April 1991, Jubb resigned from PSMI's board of directors and Marshall was appointed to serve on the PSMI board, along with Tilby, as a representative of PIS.

23. While representatives of the Mexican group, the Katz group, and the Canadians met on a frequent basis, there were no board meetings of PSMI. No minutes of meetings were submitted as exhibits at trial and no definitive written documents were submitted reflecting board decisions or policies of PSMI.

24. The evidence at trial established that the PSMI board of directors was a nonfunctioning board and a board in name only.

25. Subsequent to its formation, PSMI, which had never been properly capitalized, consistently had problems obtaining sufficient funds to meet its expenses and to develop the Tilby technology.

26. In the Spring of 1991, PSMI experienced major financial problems, including in excess of $1 million owed to creditors in British Columbia. At that time, Tilby and Katz had conversations in which Katz stated that PSMI could not rely on funding from Katz to pay Victoria's payable.

27. In June 1991, approximately $2 million was advanced by Mexican lenders. Approximately $1 million was sent to Canada, which was used to pay off some trade creditors, and approximately $700,000 was sent to Boulder, Colorado, with approximately $600,000 of that amount being used to pay back monies Katz claimed were owed to him or his family; Mexican lenders other than Patrick Patton were never identified at trial and correspondence between Patton, Astarte, and Katz was sparse.

28. In October 1991, PSMI's debts were approximately $750,000 to $800,000, with estimated assets of $100,000 to $150,000, comprised of tools, equipment, and experimental machinery.

29. In a memorandum dated November 1, 1991 from Marshall to Katz, Marshall addressed the issue of patent protection and asked Katz to confirm that he would personally pay for the patent filings "even if all other sources of financing failed and PSMI had to be shut down." Katz did not respond.

30. In January 1992, the financial condition of PSMI continued to deteriorate and PSMI anticipated having difficulties in funding payroll.

31. On February 2, 1992, Katz and Marshall had a conversation in which Katz said that he had no cash to contribute to PSMI.

32. In a memorandum to his father dated February 5, 1992, Rick Tilby, Ted's son, noted that he had suggested to Marshall month after month since April 1991 to serve, on behalf of PIS, notice of PSMI's insolvency.

33. In a February 5, 1992 conversation, Marshall discussed with Katz the need for funds to meet the payroll due on February 7, 1992. On instructions from Tilby and Jubb, Marshall also informed Katz that if the Employment Standards Branch of British Columbia undertook efforts on behalf of unpaid employees to collect amounts owed, and seized PSMI's assets, PIS could terminate the sub-license based on the insolvency of PSMI.

34. On February 7, 1992, in another conversation, Katz refused to authorize the release of monies to fund the Victoria payroll.

35. In a conversation on February 9, 1992 between Katz and Marshall, Katz estimated that between $500,000 and $750,000 would be needed through June 1992 to keep PSMI functioning. Katz recognized that there were $200,000 in payable in Canada; and Katz set out certain preconditions for further funding.

36. In a second conversation on February 9, 1992, Katz authorized the release of the funds to pay the February 7, 1992 payroll.

37. In a February 13, 1992 letter from Katz to Marshall purporting to confirm the substance of conversations between the two over the preceding days, Katz confirmed that PSMI had not been able to meet the preceding Friday's payroll in Victoria on a timely basis, and that the Katz family had deposited funds to meet the payroll. The letter further

indicated that "there will not be any additional funding" from the Katz family unless certain preconditions were met, including, essentially, the renegotiation of the royalties under the sub-license and renunciation of the right of PIS to terminate the sub-license to PSMI and to otherwise terminate the Katz family's right to share in the Tilby technology in the event that PSMI was "involuntarily shut down by its creditors."

38. In a February 14, 1992 memorandum from Marshall to Katz regarding the same conversations, Marshall indicated that Katz had proposed to supply additional funds to PSMI up through June 1992 if PIS would agree not to terminate the license with PSMI on the grounds of insolvency. Marshall conveyed PIS' agreement that if Katz agreed to fund up to $700,000 through the end of June 1992, PIS would not terminate the Sub-License Agreement unless PSMI became bankrupt or its assets were seized by creditors. The memorandum further noted that while Katz was not required by the strict language of the Letter Agreement to contribute any minimum amount toward the operations of PSMI, "the other side of the coin is that the license could be terminated if you failed or elected not to arrange the financing that could keep PSMI financially solvent."

39. In a March 1992 memoranda between Marshall and Katz, Marshall continued to address the financial needs of PSMI's Victoria office; the large amount, approximately $180,000, owing to trade creditors of the Victoria office as of mid-February; the approximately $30,000 owed to Revenue Canada and the issue of how long this obligation could be put off before proceedings would be undertaken that would result in shutting down PSMI; and the allocation by Katz of approximately $25,000 to be used to "keep creditors at bay during March."

40. In early March 1992, $300,000 in funding was received in Boulder from Mexico, in mid-April 1992, $75,000 was received in Victoria directly from Mexico, and in late April 1992, $200,000 in funding from Mexico was received in Boulder, Colorado, the place of Astarte's business. Of the funds received in Boulder from Mexico, $100,000 was forwarded to Victoria from the March funding

and $100,000 was forwarded to Victoria from the April funding to partially fund the operations there, and the remainder was used in Boulder, in part to pay back advances made by the Katz family.

41. In an April 1, 1992 letter from Katz to Marshall, Katz indicated that his family would "not advance one more dollar for Canadian or United States expenses," and indicated the PSMI should not rely upon the Katz family as a source of any future funds, until the issue of repayment of advances made to date, and how to pay future advances, was resolved.

42. Also in April 1992, Marshall requested that Katz provide copies of monthly operating statements for the Boulder office of PSMI and information regarding the amounts advanced by the Katz family and the amounts received from Mexican loans that had been credited against the advances.

43. At a meeting May 7, 1992 in Victoria, Marshall discussed with Katz the critical financial situation of PSMI, questioning the wisdom of immediately repaying Katz advances with monies received from Mexico, and Katz reiterated that his family would not advance any additional money.

44. At a meeting in late May 1992, Katz and David Jansson discussed the insolvency of PSMI and the likely termination of the sub-license, and Katz indicated that he would "bury Tilby in litigation".

45. In a memorandum dated June 1, 1992 from Marshall to Katz, Marshall confirmed that all employees in Victoria had been laid off, and told Katz that a judgment in the amount of approximately $15,000 had been entered against PSMI and in favor of Raeside Equipment, and that significant other debts were owed, including approximately $23,000 to Revenue Canada. Marshall noted that Victoria had obtained an agreement not to execute by giving Raeside $5,000 and a June 15, 1992 post-dated check for the balance. Marshall again raised the prospect of the insolvency of PSMI and the effect which such insolvency would have upon the sub-license.

46. With the prospect of PIS declaring PSMI insolvent, Marshall raised with Katz in

the June 1, 1992 memorandum what could be viewed as a potential conflict of interest. Marshall stated:

> To the extent that Pacific Industrial Systems may be entitled to cancel the license in the event of the insolvency of PSMI, it could be suggested that there was something to be gained by PIS and indirectly its shareholders through such insolvency. As you know, I hold a few shares in Pacific Industrial Systems, although on the other hand, I am also the largest single Victoria creditor of PSMI so there is considerable incentive to me to keep PSMI solvent. If you have any reason to believe that my interest in Pacific Industrial Systems would in any way actually conflict with my willingness or ability to use my best efforts to keep PSMI from going under, I would suggest that you consider having PSMI retain an independent firm of lawyers to deal with creditors.

47. Marshall received no response to the June 1, 1992 memo.

48. On June 19, 1992, after the post-dated check to Raeside had bounced, a Writ of Seizure and Sale was issued in favor of Raeside.

49. As of June 22, 1992, the rent on PSMI's Victoria premises was three weeks in arrears. The landlord subsequently changed the locks on the premises on July 1 or 2, 1992 for nonpayment of rent.

50. By memo to Katz dated June 22, 1992, Marshall indicated that "PSMI and the Mexican companies are insolvent and have been so for months." The memo again advised Katz of the precarious financial situation of PSMI and indicated that Marshall would be meeting with PIS regarding its alternatives under the Sub–License Agreement, and that unless Katz or Patton was able to indicate a probability that funding would be forthcoming immediately to pay PSMI's creditors, Marshall believed that "a parting of the ways between Pacific Industrial Systems and the Katz family is inevitable." The memorandum requested that, if Katz had any information which would tend to indicate that PSMI could be saved from its creditors, he should advise Marshall by return telecopy.

51. By memo date June 24, 1992, Marshall advised Katz that PIS has instructed Marshall to give notice that the PSMI sub-license would be terminated unless the insolvency of PSMI was remedied on or before July 1, 1992. By letter date June 24, 1992, written on his law corporation letterhead and addressed to PSMI, Marshall advised that it was clear that PSMI was insolvent, and that, on the instructions of his client, PIS, formal notice was given that unless the insolvency of PSMI was remedied on or before July 1, 1992, PIS would terminate the Sub–License Agreement.

52. In a conversation between Marshall and Katz on June 25, 1992, Katz did not dispute the assertion the PSMI was insolvent, nor did he suggest that PSMI has the ability to pay its debts. Katz did not indicate that his family was committed to paying PSMI's payable. Rather, because directors and officers have personal liability for wages and money owing to Revenue Canada, Katz asked whether there were assets in Victoria which could cover the amounts for which there was personal exposure.

53. Katz' testimony at trial that he was willing to advance funds to avoid termination of the sub-license is contradicted by the testimony of other witnesses, including Marshall and David Jansson, and by exhibits received at trial to the effect that Katz was not exploring means of remedying the insolvency, but was planning for litigation over the termination of the sub-license.

54. Pursuant to the terms of the Sub–License Agreement, the relevant test for determining insolvency under the circumstances is found in § 2 of the Bankruptcy Act of Canada which defines an insolvent person as one:

(a) Who is for any reason unable to meet his obligations as they generally become due,

(b) Who has ceased paying his current obligations in the ordinary course of business as they generally become due, or

(c) The aggregate of whose property is not, at a fair valuation, sufficient, or, if

disposed of at a fairly conducted sale under legal process, would not be sufficient to enable payment of all his obligations, due and accruing due ...

The test for insolvency is thus a disjunctive test, with any of three criteria being sufficient.

55. At least as of June 24, 1992, and probably for at least six months prior thereto, the financial condition of PSMI was such that PSMI met the test for insolvency under each of the three tests enumerated above.

56. The insolvency of PSMI was not remedied on or before July 1, 1992, and PSMI was still insolvent on July 2, 1992.

57. Marshall, acting on the instructions of the directors of PIS, gave notice by letter and memo dated July 2, 1992 that the Sub-License Agreement was terminated effective immediately.

58. Marshall was not a director of PIS, and he acted in his capacity as an attorney for PIS in conveying to PSMI notices of insolvency and notice of termination of the Sub-License Agreement.

59. Marshall owed fiduciary duties both to PSMI, as a director, and to PIS, as its attorney. Marshall also owned a duty of confidentiality to his client PIS. PSMI clearly had knowledge or notice that Marshall, by virtue of the duties owed by him to PIS, would be acting of behalf of PIS, and Katz would initiate contacts with Marshall in his capacity as attorney for PIS.

60. Marshall also acted as one of the attorneys for PSMI in certain limited matters in Canada, with the full knowledge of Katz and PSMI that Marshall was also PIS' attorney. There are no allegations, and there is no evidence, that Marshall acted below the standard of care with regard to those matters or failed to do anything but protect the best interests of PSMI in those matters. Marshall never acted as an attorney for PSMI in any situation where an actual or potential conflict with PIS existed, with the exception of the conflict disclosed in the June 1, 1992 memo. The evidence is overwhelming the Marshall kept the Katz family and Astarte informed of the continuing precarious financial condition of PSMI.

61. There was full disclosure of the potential conflicts resulting from Marshall serving as a director of PSMI as a representative of PIS and from serving as PIS' attorney. The Court finds that PSMI (and Astarte) consented to these dual loyalties by Marshall.

62. Marshall was not engaged in a scheme to surreptitiously bankrupt PSMI for the purpose of terminating the sub-license.

63. Marshall warned Katz as early as February 1992 of the possibility of termination of the sub-license and spent the next several months advising Katz to pay the creditors.

64. Marshall complied with any fiduciary duties he owed to PSMI in connection with the possible termination of the sub-license by making full disclosure as early as February 1992 of the intent of PIS to terminate the sub-license in the event of insolvency.

65. Marshall first heard of Mussabeh Almuhairi, a wealthy Arab expressing a potential interest in the Tilby technology, on June 5, 1992, and was first introduced to him at a lunch meeting on June 27, 1992. At the June 27th meeting, no proposals for a business relationship between the Tilbys and Almuhairi were discussed.

66. On June 30, 1992, Marshall attended another meeting attended by, among others, Tilby and Almuhairi's Canadian attorney, William Steeper, during which Steeper was exploring the situation to see if there was a deal Almuhairi could look at. At that time, because of PSMI's problems, Steeper did not want to become involved.

67. Although Almuhairi contacted the Tilbys in late May 1992, the relationship was initially primarily social and no agreement to do business was reached until August 1992. At the time of the termination of the sub-license, the Tilbys did not have another source of funding to pursue the technology.

68. Based on the testimony of Almuhairi, Steeper, Ted Tilby, Rick Tilby, and Marshall, the Court finds that Almuhairi was not interested in doing business with PSMI, that Almuhairi encouraged Tilby to resolve his differences with Katz and Astarte, and that Almuhairi did not encourage the Tilbys to cut

off their relationship with Astarte and the Katz group so Almuhairi could do business with the Tilbys.

69. Almuhairi's unwillingness to do business with PSMI was recognized by an expert witness called by PSMI, Professor Ted Fiflis, a University of Colorado law professor who testified on the question of breach of fiduciary duty.

70. Almuhairi only considered doing business with the Tilbys after the PSMI sublicense had been terminated.

71. Throughout the contacts with Almuhairi, Marshall was acting as attorney for PIS and Tilby. Marshall thus owed a duty of loyalty and confidentiality to his client, PIS, which has to be considered in conjunction with his duties as a director of PSMI.

72. There is no evidence that Marshall induced either the Mexican defendants or PSMI's employees to breach any alleged contract with PSMI or that Marshall interfered with the Mexican defendants' or PSMI's employees' performance of any contract.

73. Plaintiffs failed to prove by a preponderance of the evidence that Marshall engaged in conduct constituting tortious interference with contract.

74. No meeting of the minds was reached by Marshall, Tilby, PIS, and/or Almuhairi to engage in a course of action to breach the fiduciary duties owed by Marshall to PSMI, to tortiously interfere with PSMI's business and corporate relationships, to defraud Astarte and PSMI, to usurp PSMI's corporate opportunities, or to infringe on the patents relating to the Tilby technology.

75. No unlawful overt acts were committed by Marshall, Tilby, or PIS in furtherance of the alleged civil conspiracy.

76. The evidence regarding the purported Morales transaction is not credible. No information regarding any transactions or any exact business contracts were presented at trial. Furthermore, there was no credible evidence introduced at trial that plaintiffs had any contracts or potential contracts for sale of another Tilby system.

77. The Tilby system and technology had never been operated on a commercially viable basis and had never earned a profit.

78. E.J. Janik's opinion regarding damages suffered by plaintiffs is based on hypotheticals with no credible basis in fact.

79. The Court finds and concludes that plaintiffs' claim for lost profits is too speculative, remote, conjectural, imaginary or impossible of ascertainment.

80. With regard to PSMI's claims for out-of-pocket expenses, including attorneys' fees, as damages under the breach of fiduciary claim, there was no proof that the expenses had been incurred by PSMI rather than by some other individual or entity. Plaintiffs have thus failed to prove PSMI's entitlement to these damages.

81. Plaintiffs also failed to prove that any alleged breach of fiduciary duty on Marshall's part caused plaintiffs to sustain as damages these out-of-pocket expenses. Tilby, PIS, and Marshall were sued because of alleged breaches by Tilby, PIS, and Marshall. That Tilby and PIS settled on the morning of trial is no basis for treating the attorney fees and expenses incurred in this action as an element of damages sought against Marshall. Plaintiffs have established no basis for departing from the rule in Colorado that attorney fees are not recoverable simply because you have sued someone for an alleged wrong.

82. An award against Marshall of out-of-pocket expenses, including attorneys' fees, would constitute a double recovery to PSMI since the amount it seeks for out-of-pocket expenses, including attorneys' fees, was included in the value of the settlement with Tilby and PIS which was reached at the commencement of trial.

## II. Conclusions Of Law

We find and conclude that all principles to the transactions: Katz, the Tilbys, and Marshall, are sophisticated business individuals who have had considerable business experience in high figure financial transactions. In addition, Katz and Marshall are legally trained. There was no overreaching by any of these parties and we find that none of the

parties are naive, non-sophisticated business individuals.

Throughout the trial, it was apparent that all of the transactions and dealings between the parties were loosely handled. Among the many examples, the directors of the corporations overlapped and minutes were not taken at board meetings.

## A. Claims Asserted

PSMI asserts claims for damages against Marshall for breach of fiduciary duty, usurpation of corporate opportunity, and tortious interference with the business and contractual relationship between PSMI and the Mexican Defendants and between PSMI and its employees. In addition, PSMI and Astarte seek damages against PIS, Ted Tilby and Marshall for civil conspiracy.

## B. Breach of Fiduciary Duty

PSMI's breach of fiduciary duty claim essentially has two components: (1) that Marshall wrongfully terminated the sub-license with PSMI; and (2) that Marshall seized PSMI corporate opportunities for his own benefit, while serving as a director of PSMI.

### 1. Insolvency

■ If the Court concludes that PSMI was legally insolvent, then it is not necessary to reach the issue of a breach of fiduciary duty by Marshall. The Court concludes that PSMI was indeed insolvent under each of the three tests enumerated above, at least as of June 24, 1992, and probably for at least six months prior thereto. (*See* Findings of Fact ¶ 54). Because that insolvency was not remedied by July 1, 1992, and PSMI remained insolvent on July 2, 1992, PIS was entitled to terminate the Sub–License Agreement pursuant to ¶ 9.2. (Plaintiffs' Ex. 11).

The evidence at trial was overwhelming that PSMI was insolvent at least as of June 24, 1992 and continuing up through the termination of the sub-license. Indeed, David Jansson, the president of PSMI, testified that PSMI, as a whole entity was insolvent at least as of June 24, 1992, and continued to be insolvent as of the termination of the sub-license. Gary Appel, an expert witness on

bankruptcy and insolvency called by Marshall, opined in his report (Defendant's Ex. I–18), and in his testimony at trial, that PSMI was insolvent at all relevant times under each of the three tests. In contrast, Larry Prentice, an insolvency expert called by the plaintiffs, opined in his report (Plaintiffs' Ex. 265), and testified at trial, that he did not reach a conclusion as to PSMI's financial position and whether it was insolvent; that he did not know what funds, if any, were available to pay debts in June 1992; and that he was *not expressing an opinion on PSMI's insolvency*.

In addition, there are no circumstances present which negate the strictures of insolvency. Plaintiffs asserted at trial that Katz was willing to fund PSMI and would have advanced the funds necessary to avoid termination of the sub-license. Plaintiffs also assert that they were able to settle with some creditors after the termination of the sub-license. Also, plaintiffs assert that PSMI was technically insolvent since its inception.

In advancing these claims, plaintiffs ignore certain salient facts and law. There is no evidence that Katz attempted to or did advance funds in June 1992 to remedy the insolvency. The record is void of any written documentation from Katz in the period of June 1, 1992 through July 1, 1992 addressing the pending financial crises raised in Marshall's June 1 memo, disputing the declaration of insolvency, or posing a remedy to avoid termination of the sub-license. While Katz testified at trial that he would have advanced the funds, rather than face termination of the sub-license, his silence in the above action refutes this claim.

It is irrelevant if the plaintiffs had been able to pay or otherwise compromise some of PSMI's debts following termination, because it is the condition of PSMI at the time of the declaration of insolvency which is at issue. *See Dimple Diapers Inc. v. Paperboard Industries Corp.*, 15 Can.Bank.Rep. (3d) (1992) (Plaintiffs' Ex. 301).

■ Finally, the fact that PSMI may have been undercapitalized from its inception in no way violates PIS' rights under the Sub–License agreement. The testimony of David

Jansson, Ted Tilby, Rick Tilby, and Marshall at trial, and the terms of the May 18, 1990 Agreement (Plaintiffs' Ex. 4), demonstrate that Tilby and PIS were contributing to the technology of PSMI and that it was the responsibility of Katz and Astarte to raise the financing necessary for establishing the operations of PSMI. (*See* Plaintiffs' Ex. 4 at p. 6).

In any event, the evidence demonstrates that despite the allegedly technical insolvency of PSMI since its inception, and a continuing pattern of financial problems, PIS did not exercise its right of termination until all employees had been laid off in Victoria, judgment had been entered, a Writ of Seizure and Sale had been issued, and the landlord changed the locks on the Victoria office.

### 2. Fiduciary duties

██ Defendant Marshall, as a director, owed a fiduciary duty to PSMI. *T.A. Pelsue Company v. Grand Enterprises, Inc.*, 782 F.Supp. 1476 (D.Colo.1991); *United States v. Gates*, 376 F.2d 65, 77 (10th Cir.1967). Also, Marshall was a PSMI attorney during all relevant times, and thus owed a fiduciary duty to his client to exercise his independent professional judgment on behalf of PSMI. ABA Code of Prof. Resp., Canon 5; EC5–18.

██ A director must act with an extreme measure of candor, unselfishness and good faith as his office is one of trust and he is held to the high standard of duty required of trustees. *River Management Corp. v. Lodge Properties, Inc.*, 829 P.2d 398, 404 (Colo.App.1991). A director must protect the rights of the company and act openly, and must manage the corporate affairs in good faith, within the limits of the law applicable, and give the corporate entity the benefit of his best judgment and care. *Great Western United Corp. v. Great Western Producers Co–Operative*, 41 Colo.App. 349, 588 P.2d 380 (1978), *aff'd*, 200 Colo. 180, 613 P.2d 873 (Colo.1980).

#### a. Multiple Loyalties

Multiple loyalties do not, *per se*, constitute a breach of fiduciary duty. It is undisputed that Marshall may have owed duties in his various roles: as attorney for PIS, as a director of PSMI, and as an attorney for PSMI. However, the term "fiduciary duty" to which a corporate director is bound, is not capable of precise definition for all directors of all corporations. *See Washington Bancorporation v. Said*, 812 F.Supp. 1256, 1265 (D.D.C.1993). Here, under the circumstances, apparent conflicts between the various duties do not establish a breach of any fiduciary duty.

██ Directors may have interests which appear to conflict with the fiduciary duties owed to the corporation, and this apparent conflict does not, *a fortiori*, constitute a breach of fiduciary duty. For example, § 7–5–114.5, C.R.S. (1986 Repl. Vol. 3A), provides that contracts between a corporation and one of its directors or between corporations sharing similar directors shall not be void or voidable solely for that reason if certain conditions are met such as full disclosure and approval or ratification by disinterested board members or shareholders, or that the transaction be fair to the corporation. Similarly, Colorado common law provides that a contract between companies with common directors was voidable and not void, and was not inherently invalid or void because of the relationship alone. *Colorado Management Corp. v. American Founder Life Insurance Co.*, 145 Colo. 413, 418, 359 P.2d 665, 668 (1961). Likewise, a director can do business with a corporation at a profit if there is full and fair disclosure, and if there is no unfairness or fraud. *Swafford v. Berry*, 152 Colo. 493, 498, 382 P.2d 999, 1002 (1963); *Kapushion v. Colorado West Packers Inc.*, 701 P.2d 625, 627 (Colo.App.1985). The law thus recognizes that there are some instances when a director may advance the best interests of himself or a third party without violating the fiduciary duties owed to the corporation.

Accordingly, under the law, and as both of the expert witnesses on fiduciary duty—Professor Ted Fiflis and Jack Berryhill—opined, a breach of duty arising out of the representation of conflicting interest can be avoided by full disclosure and consent.

#### b. Codes

██ Provisions of the Codes of Professional Conduct are not implicated under the

circumstances. Excerpts of the Code of Professional Conduct in Canada and British Columbia regarding representing conflicting interests were received in evidence (Plaintiffs' Exs. 1 and 2). However, under the law of British Columbia, Canada, or Colorado, ethical codes are not designed to prescribe standards for civil liability of attorneys and do not create a private cause of action. *Miami International Realty Co. v. Paynter,* 841 F.2d 348, 352 (10th Cir.1988); *Weiszmann v. Kirkland and Ellis,* 732 F.Supp. 1540, 1544 (D.Colo.1990).

■ Furthermore, it does not appear that the codes of conduct are implicated here. The ethical obligations concerning representation of conflicting interests pertain to representing clients. Here, Marshall's role as PIS' attorney and his role as a director of PSMI does not implicate conflicting attorney-client relationships.

Even so, Marshall, a Canadian attorney, did not violate any Code of Professional Conduct. For the reasons stated in these sections, Marshall abided by all of the standards set forth in the provisions. Marshall handled the situations with the utmost regard towards his professional duties. Here, even more telling is the fact that nearly all persons involved in this case were attorneys and were aware of the Codes of Professional Conduct to which they are bound.

#### c. Full Disclosure

The structure of the PSMI board of directors, with Astarte or the Katz interests selecting two board members and PIS selecting the other two board members, was replete with potential conflicts from its inception. For example, conflicts arising out of PIS' right to terminate the Sub–License agreement with PSMI, and conflicts in the Katz interests loaning money to PSMI and demanding repayment existed. Nevertheless, with regard to Marshall, the evidence demonstrates that there was full disclosure, recognition, and consent with respect to his action in multiple roles.

According to the memoranda between Katz and Marshall, and their testimony, plaintiffs knew from negotiations prior to the execution of the May 1990 Agreement that Marshall was PIS' attorney, knew that he was serving on PSMI's board as a representative of PIS, and knew he was acting on behalf of PIS with regard to PSMI. (*See, e.g.,* Exs. K25, A20, 40, 63, 67, 68, 90, 96, 115). PSMI clearly had knowledge and notice that Marshall, by virtue of the duties owed by him to PIS, would be acting on behalf of PIS, and his conduct must be evaluated in light of the existence of the dual loyalties. Thus, there was full disclosure and consent regarding Marshall's multiple roles.

Further, it is also significant that Marshall is a non-management, or outside, director. Non-management directors are not expected to devote all of their time and attention to a single corporation and indeed are often selected because of their connection with another business enterprise. Commentators have suggested that the corporate opportunity doctrine should not be applied with the same rigor to close corporations as it should to public corporations, with outside directors being afforded more freedom than full-time executives. *See* V. Brundney & R. Clark, "A New Look at Corporate Opportunities," 94 HARV.L.REV. 997, 1044 (1981).

#### d. Termination of the sub-license.

■ Marshall did not breach any fiduciary duty to PSMI by communicating to PSMI, in his representative capacity as PIS' attorney, PIS' determinations declaring PSMI insolvent and termination the Sub–License Agreement pursuant to the express terms of ¶ 9.2. (Plaintiffs' Ex. 11). Moreover, Marshall complied with any fiduciary duties he owed to PSMI by making full disclosure as early as February 1992 of the intent of PIS to terminate the sub-license in the event of insolvency.

In addition, an expert on fiduciary duty called by Defendant Marshall, Jack Berryhill, Esq., testified that, based on his review of the facts, Marshall was the only director of PSMI striving to keep PSMI functioning and to avoid insolvency. (Defendant's Ex. I–16). In June 1992, Marshall provided Katz with ample warning of the severity of the problems and the likely consequences, and his communications went unanswered. Marshall thus did not breach any fiduciary duty he owed to PSMI by conveying, in his capacity

as PIS' attorney, the decisions made by PIS to exercise its right to declare PSMI insolvent and, subsequently, to terminate the sub-license.

The mere fact that Marshall was the messenger of the notice of termination of the sub-license agreement does not breach his duty as a director of PSMI. Indeed, as Berryhill testified, he would have been under an obligation to inform PSMI or PIS's decision once he knew of it. (Defendant's Ex. I–16). He did just this. PIS terminated the Sub–License Agreement, not Marshall. Marshall was simply acting on behalf of PIS as its agent.

**e. Usurpation of a corporate opportunity**

■ The duty not to usurp corporate opportunities is one of the fiduciary duties that a director owes to a corporation. *See Collie v. Becknell,* 762 P.2d 727 (Colo.App.1988). Accordingly, PSMI's claim for usurpation of corporate opportunity does not state a separate claim for relief, but constitutes an allegation of breach of fiduciary duty.

■ In *Collie,* the Court found that a corporate officer defeated the corporate business plans and purposes when he employed his individual financial resources to acquire a corporation's assets for his own benefit, even though the corporation was insolvent. The duty not to usurp a corporate opportunity includes the duty not to engage in enterprises directly in competition with and necessarily having an injurious or detrimental effect on the corporation's business. *See T.A. Pelsue Company v. Grand Enterprises, Inc.,* 782 F.Supp. 1476, 1485 (D.Colo.1991); *Williams v. Stirling,* 40 Colo.App. 463, 583 P.2d 290, 292 (1978).

■ With regard to the second component of the breach of fiduciary claim—the alleged usurpation of corporate opportunity—PSMI must establish that it had an actual or expected interest in an asset or property, and that it had the financial ability to acquire the asset or property. *See Collie,* 762 P.2d at 730. Even though a corporation might have had some rights with regard to the acquisition of property, in order for that opportunity to be usurped, the acquisition must have been within the corporation's ex-

pectation. *Three G Corp. v. Daddis,* 714 P.2d 1333, 1336 (Colo.App.1986). Similarly, to establish an expectancy, it is not sufficient for plaintiff to show only that a proposed opportunity possesses value to it, but plaintiff must also show that there is a practical, not a mere theoretical, basis for the opportunity. *See Colorado and Utah Coal Co. v. Harris,* 97 Colo. 309, 313, 49 P.2d 429 (1935).

■ The evidence at trial demonstrates that Mussabeh Almuhairi did *not* represent a corporate opportunity for PSMI and did *not* warrant disclosure. First, in his deposition, Almuhairi indicated that he was not interested in doing business with PSMI (Plaintiffs' Ex. 296 at p. 41), and Ted and Rick Tilby confirmed this in their testimony. Second, a breach of fiduciary expert called by PSMI, Professor Fiflis, testified that it was his understanding that Almuhairi made it clear that he did not want to deal with the Katz interests and expressed an interest in doing business with Tilby only after the relationship with Astarte and the Katz group was cleaned up. Third, the evidence at trial indicated that although Almuhairi contacted the Tilbys in late May 1992, the relationship was initially primarily social and no agreement was reached until August 1992. A venture involving Katz and Almuhairi was not a practical corporate opportunity of PSMI.

Marshall's contacts with Almuhairi were minimal and he never acted to further his own personal interests. As Jack Berryhill testified, under the circumstances, with Almuhairi not representing corporate opportunity of PSMI, Marshall did not breach his fiduciary duties to PSMI by not disclosing the Almuhairi contacts. There was no actual or expected interest in a deal with Mr. Almuhairi and PSMI did not have the financial ability to secure a deal even if an interest had existed. *See Collie* 762 P.2d at 730.

**C. Tortious Interference**

■ With regard to PSMI's claim for tortious interference, PSMI alleges that PIS, Tilby and Marshall have "interfered with the business and contractual relationship between PSMI and the Mexican Defendants and between PSMI and its employees." Un-

der Colorado law, the tort of intentional interference with contract "is premised on the existence of a contract between a plaintiff and a third party." *Colorado National Bank v. Friedman*, 846 P.2d 159, 170 (Colo.1993). "The tortious conduct occurs when the defendant, not a party to the contract, induces the third party to breach the contract, or interferes with the third party's performance of the contract." *Id.* Here, there is no allegation or evidence that Marshall induced either the Mexican defendants or PSMI's employees to breach any alleged contract with PSMI or that Marshall interfered with the Mexican defendants' or PSMI's employees' performance of any contract. The essence of the tort is to punish activity intentionally aimed at inducing a breach of or preventing performance of the contract between plaintiff and third parties. *Id.* That third parties are allegedly adversely affected by termination of the agreement between PSMI and PIS does not suffice to state a claim for tortious interference.

### D. Civil Conspiracy

■ The elements for a claim of civil conspiracy are: (1) two or more persons, and for this purpose a corporation is a person; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof. *Jet Courier Service, Inc. v. Mulei*, 771 P.2d 486, 502 (Colo.1989). Here, plaintiffs have alleged that PIS, Tilby and Marshall have conspired together and with Almuhairi to: (1) breach the fiduciary duties owed by Marshall and Tilby to PSMI; (2) tortiously interfere with PSMI's business and contractual relationships; (3) defraud Astarte and PSMI; (4) usurp the corporate opportunities owned by PSMI; and (5) infringe on the patents.

■ Plaintiffs have failed to prove elements necessary to the existence of a civil conspiracy. Plaintiffs have not established that a meeting of the minds was reached by Marshall, Tilby, PIS or Almuhairi to engage in a course of action to breach the fiduciary duties owed by Marshall to PSMI, to tortiously interfere with PSMI's business and

corporate relationships, to defraud Astarte and PSMI, to usurp PSMI's corporate opportunities, to infringe on the patents relating to the Tilby technology, or to commit any unlawful act. PIS, at all times, in any event, had the right to terminate the Sub–License Agreement because of the insolvency of PSMI.

■ In addition, the evidence at trial was that the acts allegedly committed by Marshall were done within the scope of this attorney-client relationship with PIS and Tilby. An attorney, being an agent of his principal, cannot be held liable for conspiracy with his principal where the agent acts within the scope of his authority and do not rise to the level of active participation in a fraud. *See, e.g., Worldwide Marine Trading Corp. v. Marine Transport Service, Inc.,* 527 F.Supp. 581, 586 (E.D.Pa.1981); *Fraidin v. Weitzman,* 93 Md.App. 168, 611 A.2d 1046, 1079 (1992).

Simply stated, the plaintiffs did not establish by a preponderance of the evidence that Marshall conspired with any person or entity to deprive Astarte of any rights or entitlements. In addition, alleged parties to the conspiracy: the Tilbys and PSI, were dismissed out and matters relating to these parties have been resolved. Thus, we are left without any viable parties that were co-conspirators with Marshall.

### E. Damages

#### 1. Lost profits

■ The Court has held that Marshall did not breach any fiduciary duties. Even if a breach had occurred, "lost profits are not available if they are speculative, remote, imaginary or impossible of ascertainment." *Western Cities Broadcasting, Inc. v. Schueller,* 849 P.2d 44, 50 (Colo.1993). PSMI's claims for lost profits are based upon hypothetical models advanced by E.J. Janik, an expert witness on damages called by the plaintiffs. (Plaintiffs' Ex. 260). However, these models are insufficient given the fact that the technology has never been operated on a commercially viable basis, and plaintiffs have produced no evidence of actual lost business opportunities. While some testimo-

 

ny was elicited about the purported Morales transaction, plaintiffs never produced and introduced the alleged contract, and provided no credible evidence of the terms of the alleged deal. To the contrary, both Marshall and David Jansson testified that Morales was a phantom deal. In addition, Vincent Zarlengo, an expert witness called by Defendant, opined and testified that plaintiffs' claim for lost profits was too speculative given the history of the venture, the lack of any concrete future opportunities, and the vagaries of conducting business in third-world countries. (Defendant's Ex. I–17). The plaintiffs either experienced no loss, or if they have experienced a loss, it cannot be determined in an economical manner. (Defendant's Ex. I–17).

## 2. Other Damages

Based on a review of the transcripts of the May 5, 1993 hearing and portions of proceedings on October 22, 1993, the Court concludes that only the issue of attorneys' fees awardable to the prevailing party under the terms of the May 1990 Letter Agreement, to which agreement Marshall was not a party, were reserved for proof post-trial by affidavit.

■ Plaintiffs were compensated for their out of pocket expenses in the settlement with Tilby and PIS. The value of the settlement with Tilby and PIS thus subsumes the out of pocket expenses incurred by plaintiffs. The Court further finds and concludes that an award against Marshall of out-of-pocket expenses, including attorneys' fees, would constitute a double recovery to PSMI since the amount it seeks for out-of-pocket expenses, including attorneys' fees, was included in the value of the settlement with Tilby and PIS which was reached at the commencement of trial.

## III. Order

ACCORDINGLY, it is ORDERED that:

(1) The Court finds the issues in favor of Defendant Marshall and against Plaintiffs Astarte and PSMI;

(2) The Clerk of the Court is DIRECTED to enter judgment for Defendant Marshall and against Plaintiffs Astarte and PSMI; and

(3) Defendant Marshall shall have his court costs recovered upon the filing of a bill of cost with the Clerk of the Court as provided by FED.R.CIV.P. 54(d) and D.C.COLO. LR 54.1.